## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CIBANCO S.A., INSTITUCIÓN DE BANCA MULTIPLE**,<br>Is General Mariano Escobedo 595, Col. Polanco<br>Miguel Hidalgo<br>Mexico City, 11560, México | Case No. |
| **Plaintiff,** | |
| v. | |
| **SCOTT BESSENT**, in his official capacity as Secretary of the Treasury;<br>1500 Pennsylvania Avenue, NW<br>Washington, D.C. 20220 | |
| **U.S. DEPARTMENT OF THE TREASURY**;<br>1500 Pennsylvania Avenue, NW<br>Washington, D.C. 20220 | |
| **ANDREA GACKI**, in her official capacity as Director of the Financial Crimes Enforcement Network;<br>PO Box 39<br>Vienna, VA 22183 | |
| **FINANCIAL CRIMES ENFORCEMENT NETWORK**,<br>PO Box 39<br>Vienna, VA 22183 | |
| **Defendants.** | |

## COMPLAINT

**Introduction**

1.      In the coming days, CIBanco S.A., Institución De Banca Multiple ("CIBanco" or "the Bank") will cease to exist as an international commercial bank because of a misguided order issued by the U.S. Department of the Treasury under new authorities to combat opioid trafficking. CIBanco wholeheartedly supports the U.S. government's efforts to fight the opioid epidemic and the Mexican drug cartels. It vehemently condemns the unlawful activities of drug traffickers and their attempts to gain access to legitimate financial institutions. That is why CIBanco was shocked to learn that the Treasury Department, through its Financial Crimes Enforcement Network ("FinCEN"), issued an order (the "Order") cutting off CIBanco from the U.S. financial system. FinCEN issued this Order, which is now set to take effect on September 4, 2025, without ever notifying CIBanco or providing it an opportunity to confront whatever evidence FinCEN purports to have that the Bank facilitated the trafficking of opioids.

2.      Without adequate process to demonstrate that these allegations are false, CIBanco faces imminent demise. Among its many catastrophic effects, this Order risks stranding over $40 billion of legitimate funds managed by CIBanco on behalf of U.S. interests—American pension funds, investment funds, companies, and individual U.S. citizens. Most of CIBanco's business integrally relies on access to U.S. dollar transactions, and its very existence is jeopardized by the Order. Indeed, the majority of CIBanco's business will be lost before the Order's effective date as U.S. financial institutions are shutting down their businesses with CIBanco in advance of the September 4, 2025 deadline; CIBanco's last U.S. correspondent bank recently gave notice that it would terminate its relationship with CIBanco on August 21, 2025 due to the Order, necessitating the urgency of this Complaint. Mexican regulators have commenced procedures to place CIBanco

under their receivership, in anticipation of the Bank failing under the weight of the Order's irreparable harm.

3.    FinCEN issued the Order through its first-ever exercise of authority found in 21 U.S.C. § 2313a, which codifies § 3201(a) of the FEND Off Fentanyl Act. While the statute envisions a range of tools, FinCEN imposed the statute's maximum penalty without any forewarning or as much as a single conversation with CIBanco. Labeling the Bank a financial institution of "primary money laundering concern in connection with illicit opioid trafficking," FinCEN will bar the transmittal of any funds between CIBanco and all U.S. financial institutions and financial agencies. In short, FinCEN has imposed the "death penalty" on the Bank, while acting as the prosecutor, judge, and jury.

4.    FinCEN imposed the Order in a manner intended to avoid any due process to which CIBanco is entitled. The Order lacks sufficient specificity for CIBanco to challenge its allegations. Despite repeated attempts, FinCEN has refused to provide CIBanco with any supporting proof behind its conclusory accusations. CIBanco finds itself before a proverbial Star Chamber, where it is afforded no details of the charges and no meaningful opportunity to defend itself. That lack of due process, sadly, seems intentionally to be a feature, not a bug, of the Order.

5.    CIBanco has repeatedly pressed FinCEN for details because, substantively, the allegations against the Bank are so vague that it can only speculate and frantically search for what the government might even possibly be talking about—and to date it has found nothing that would support the allegations in the Order. In short, CIBanco is being sentenced to an institutional death on allegations so bereft of specificity as to be non-existent and so thin that they could not remotely support the suggestion that the Bank is in fact a "primary money laundering concern in connection with illicit opioid trafficking." As described below, the Order points to only a handful of purported

incidents spread out over more than a decade, most of which involve transactions involving unnamed "Mexico-based companies" or "China-based companies" for what the Order implies—but never explicitly describes—were opioid precursors.

6.      Likewise, the Order does not consider, as required, CIBanco's significant and legitimate business interests, and the degree to which they will be impacted by the imposition of barring CIBanco from the U.S. financial system. The Order also improperly ignores obvious and less severe measures to address the concerns articulated by the Order, all of which are authorized under the new authority being exercised.

7.      This Order is misguided and will not further the Administration's important mission against illicit opioids. This Court will find no satisfying explanation for how FinCEN, on this meager record and without ever confronting CIBanco, reached the erroneous conclusion that the Bank is a "primary money laundering concern in connection with illicit opioid trafficking." To the contrary, CIBanco is one of Mexico's largest banks and has spent extensive time and resources building a compliance and anti-money laundering program equivalent to those of U.S. banks. If CIBanco qualifies for the death sentence under § 2313a, then countless other banks around the world do as well, rendering the word "primary" in the statute meaningless.

8.      In short, FinCEN's publication of the final Order violates the requirements of the Administrative Procedures Act, as well as the due process requirements under the U.S. Constitution. Without immediate correction, this unlawful Order risks the Bank's insolvency and collapse.

<u>**Jurisdiction and Venue**</u>

9.      This Court has jurisdiction under 28 U.S.C. § 1331.

10.     Sovereign immunity is waived by 5 U.S.C. § 702.

11.     Venue in this Court is proper under 28 U.S.C. § 1391(e).

## Parties

12.     Plaintiff CIBanco is an international commercial bank headquartered in Mexico City, and its primary place of business is Mexico. CIBanco is the subject of the Order issued by FinCEN under § 3201(a) of the FEND Off Fentanyl Act (which is codified in 21 U.S.C. § 2313a) and published at 90 Fed. Reg. 27770 (June 30, 2025). The Order was initially set to take effect 21 days after publication in the Federal Register, but that date was extended to September 4, 2025. 90 Fed. Reg. 30826 (July 11, 2025).

13.     Defendant Scott Bessent is sued in his official capacity as Secretary of the Treasury. The Secretary implements and administers § 3201(a) of the FEND Off Fentanyl Act. Secretary Bessent has delegated this authority to the Director of FinCEN. The Secretary is located in Washington, D.C.

14.     Defendant U.S. Department of the Treasury is the executive agency led by Secretary Bessent, which has responsibility for implementing and administering § 3201(a) of the FEND Off Fentanyl Act. The Department is located in Washington, D.C.

15.     Defendant Andrea Gacki is sued in her official capacity as Director of FinCEN. The Director has been delegated the authority to implement and administer § 3201(a) of the FEND Off Fentanyl Act. She exercised this authority to issue the Order that is the subject of this lawsuit. Director Gacki is located in Vienna, Virginia.

16.     Defendant FinCEN is a bureau within the U.S. Department of the Treasury, and it is led by Director Gacki. FinCEN issued the Order that is the subject of this lawsuit. FinCEN is located in Vienna, Virginia.

## Overview of CIBanco

17.    CIBanco traces its roots back more than forty years, when a group of entrepreneurs started a currency exchange house called Consultoría Internacional. Consultoría Internacional grew and, in 2008, the Mexican government authorized its transformation into CIBanco, which now operates 222 branches across Mexico. Prior to the Order, it was the 20th largest bank in Mexico, with $7 billion in assets as of May 2025 and over $144 billion in processed transactions between 2015 and May 2025. Today, CIBanco employs more than 3,000 employees and serves tens of thousands of customers across the world. CIBanco is one of the five largest originators of car loans in Mexico. In a partnership with Visa, CIBanco issued more than 200,000 debit and prepaid cash cards to Bank customers, giving them access to the digital economy. CIBanco also plays a key role in the currency exchange market, providing both commercial and individual customers the critical ability to quickly and easily exchange fiat currencies, such as U.S. dollars for Mexican pesos (or vice versa). In addition to its spot currency exchanges, CIBanco also offers financial derivative products that allow customers to hedge against currency risks (e.g., protect against a rise or fall of the Mexican peso).

### *CIBanco's Trust Business*

18.    Through its trust division, CIBanco serves as the trustee for thousands of trusts.[1] Trusts are a key financial vehicle in Mexico and are, due to Mexican regulations, a particular necessity for the deployment of foreign capital inside Mexico. CIBanco currently operates the largest trust division in Mexico—having acquired several trust divisions from financial institutions

---

[1] A trustee holds legal title and fiduciary responsibility for the assets in trust on behalf of the beneficial owner or owners.

including Bank of New York Mellon and Deutsche Bank—and its trust division is valued at approximately $400 million.

19.    CIBanco serves as trustee for numerous foreign (non-Mexican) beneficiaries, including for over 700 trusts on behalf of U.S. beneficiaries. Through these trusts, CIBanco serves as the trustee of more than $60 billion dollars in international assets, with over $40 billion in assets for U.S. beneficiaries. U.S. beneficiaries include U.S. state and local pension funds, America's largest asset managers, and U.S. individuals. The assets held in these trusts vary significantly and include money, real estate, and collectibles.

20.    CIBanco commonly serves as a trustee for trusts that allow U.S. investors access to various Mexican projects. Likewise, CIBanco also operates trusts for hundreds of Americans and U.S. companies who own property in areas within Mexico that foreigners are otherwise prohibited from acquiring.[2] CIBanco currently administers property trusts for over 600 non-Mexican foreigners, with a total property value of approximately $250 million.

21.    As trustee, CIBanco ensures that numerous services are provided in accordance with the purposes of the trusts. These include processing transactions to pay creditors, donating to charity, making tax payments, and distributing capital according to investment agreements.

22.    CIBanco holds only a fraction of the trust assets at the Bank itself. The majority of assets are held by CIBanco in bank accounts at other financial institutions in Mexico, the United States, and Europe. As part of its trust business, as of May 2025, CIBanco operated approximately 60 trust-related bank accounts inside the United States, approximately 6,300 trust-related bank accounts at other Mexican banks, and approximately 2,000 trust-related bank accounts at CIBanco.

---

[2] Article 27 of the Mexican constitution prohibits foreigners from directly acquiring ownership of land or water within a "restricted zone," which comprises 50 kilometers inland from Mexico's beaches and 100 kilometers along the border.

(Since CIBanco, as trustee of the relevant trusts, must control the trusts' bank accounts, such accounts are commonly named "CIBanco, SA., IBM as trustee of" followed by an identification number assigned to the trust beneficiary).

23.     CIBanco's trust business is integrated within the larger Bank ecosystem and depends on the Bank's commercial banking services to process domestic and international wire transfers and foreign currency transactions, manage liquidity, and execute investment operations for trust funds. Prior to the Order, CIBanco's commercial bank team processed thousands of transactions a month related to trust services.

### CIBanco's Robust Compliance Programs

24.     CIBanco operates a conservative banking model. Approximately 98% of the Bank's transactions are settled with funds located at separate third-party banks, a process which triggers multiple know-your-customer ("KYC") reviews by multiple financial institutions.[3] If CIBanco is handling an incoming wire transfer, a review is conducted by additional financial institutions. Prior to receiving the wire, the ordering bank, U.S. correspondent bank, and any involved intermediary bank conduct their own KYC around the transaction; CIBanco likewise conducts its own independent KYC. For 90% of incoming wire transfers, CIBanco transfers the funds to a different third-party bank, which has its own KYC procedures. At bottom, given its business model—and its principal role as an intermediary in the U.S. and Mexican financial systems—there are very few transactions for which CIBanco is the only financial institution reviewing the propriety and risk of a transaction.

---

[3] To illustrate, if a CIBanco customer wishes to swap U.S. dollars for Mexican pesos at CIBanco using their U.S. bank account, CIBanco first initiates a KYC process to onboard the client as a CIBanco currency exchange client. If CIBanco is satisfied, it will then initiate the currency exchange process and send the transaction to the U.S. bank, which will initiate its own KYC procedure.

25.     To ensure the integrity of its workforce, CIBanco maintains a rigorous insider threats program, has a robust ethics policy, and provides extensive training initiatives. This program has been bolstered with the assistance of outside experts. Since 2018, CIBanco has worked with K2 Integrity ("K2"), a U.S.-based firm, to conduct qualitative and quantitative risk assessments of CIBanco from a U.S. regulatory perspective. It also engaged Barry M. Koch PLLC ("Koch"), an internationally recognized compliance leader, to assess the strengths of customer risk ratings and screening processes, as well as to assess CIBanco's monitoring/alerting scenarios, its governance of unusual operations, and its compliance committee.

26.     Over the last seven years, CIBanco has spent more than $70 million on improving its AML programs and controls—the equivalent of the Bank's combined profits over the past three years. CIBanco undergoes frequent substantive reviews of its AML/countering the financing of terrorism ("CFT") program by internal auditors, Mexican regulators, and external auditors, including Ernst & Young, to ensure the integrity and effectiveness of the program and to prevent the financial system from being used by illicit actors. CIBanco constantly continues to adapt and improve its compliance program. In February 2025, for example, in order to support the U.S. efforts for total elimination of the cartels, CIBanco engaged K2 to develop a strategic plan to address President Trump's designation of Mexican drug cartels as foreign terrorist organizations. This program, which was approved by the Board, is further enhancing the Bank's corporate governance, KYC procedures, risk assessment, technological tools, and training.

### U.S. Fund Transmittals and Correspondent Banks

27.     As part of its normal business operations, CIBanco transmits hundreds of millions of U.S. dollars to and from the U.S. financial system on a daily basis. From January 2025 through May 2025, CIBanco completed an average of approximately 1,300 transactions per day with U.S.

financial institutions, totaling an average volume of approximately $800 million in daily transactions. This total volume included an average of approximately 900 outgoing wires from CIBanco to U.S. financial institutions, and an average of approximately 400 incoming wires from U.S. financial institutions to CIBanco. Wires were most commonly transmitted for clients' commercial payments and currency exchanges (e.g., trading Mexican pesos for U.S. dollars and vice versa).

28.     CIBanco is a commercial bank with no U.S. branches, and to operate its foreign currency exchange or transact in almost any foreign currency—including U.S. dollars—it relies on U.S. correspondent banks. A correspondent bank is a financial institution that provides services, such as conducting business transactions and accepting deposits, on behalf of another financial institution. It is vital for non-U.S. financial institutions like CIBanco to maintain a relationship with U.S. correspondent banks to facilitate international financial transactions, particularly those involving the U.S. dollar. The U.S. correspondent bank acts as an intermediary, providing the foreign bank with access to the U.S. financial system. This relationship is also essential for processing a variety of cross-border services for the Bank's customers, including international wire transfers, trade finance, and foreign currency exchange. Additionally, the U.S. correspondent bank ensures that all transactions comply with U.S. regulations, such as AML and CFT laws.

29.     As discussed below, CIBanco previously maintained correspondent banking relationships with five U.S. financial institutions.[4] Since FinCEN announced the Order on June 25, 2025, all but one have withdrawn as correspondent banks to CIBanco, and the last correspondent bank has informed CIBanco that it will terminate its correspondent banking relationship in full on August 21, 2025 based on the Order's impending effective date. Losing

---

[4] The Order incorrectly states that CIBanco only had two correspondent banks.

access to U.S. correspondent banks has already significantly damaged CIBanco financially, as it is already unable to complete many of the currency exchanges and cross-border transactions that comprise the majority of its business. Prior to the Order, the U.S. portion of the trust business and foreign currency exchange with the United States generated well over 50% of CIBanco's annual income, all of which will be lost under the Order.

### U.S. Presence and Property Interests

30.    To operate within the U.S. financial system and serve its customers, CIBanco has maintained dozens of bank and related accounts within the United States at different U.S. financial institutions. These bank accounts were used to (a) effectuate U.S. dollar transactions through CIBanco's U.S. correspondent banks; (b) receive customer payments and fees from U.S. customers and companies; and (c) hold assets on behalf of various trusts, often with U.S. beneficiaries. CIBanco also has maintained key contractual relationships with U.S. companies, including correspondent banking agreements, a partnership with Visa for debit and prepaid card servicing, and various contractual agreements with U.S. counterparties used to manage currency risk in CIBanco's derivative portfolio.

#### *Correspondent Bank and Operational Accounts*

31.    Maintaining bank accounts inside the United States is key to CIBanco's core commercial banking business, as the accounts assist in currency exchanges involving U.S. dollars, international wire transfers to and from the United States, and a host of other operational functions. Prior to the Order, CIBanco's U.S. correspondent bank accounts processed 1,300 average daily transactions totaling approximately $800 million in volume. In response to the Order, however, most U.S. financial institutions have already terminated their relationships with CIBanco and

closed the Bank's accounts. CIBanco currently retains only one active account for correspondent banking and operational purposes, which is set to close August 21, 2025 as a result of the Order.

32.     At the time of the Order, for example, CIBanco maintained two bank accounts at Bank 1 in New York for correspondent banking purposes. On June 25, 2025, the accounts' total balance was approximately $5.5 million. On July 3, 2025, Bank 1 advised CIBanco that it would terminate its contractual relationship with CIBanco and close its accounts due to the Order. CIBanco's accounts at Bank 1 were subsequently closed.

33.     At the time of the Order, CIBanco maintained an account at Bank 2 in Irvine, California for correspondent banking purposes. On June 25, 2025, the account's balance was approximately $224,000. On June 25, 2025, Bank 2 advised CIBanco that it would terminate its contractual relationship with CIBanco and close its account due to the Order. CIBanco's account at Bank 2 was subsequently closed.

34.     At the time of the Order, CIBanco maintained two bank accounts at Bank 3 located in Miami, Florida. These accounts were used, among other things, for correspondent banking services, and to receive payments and fees from customers in connection with trust administration services. As of June 25, 2025, the accounts' total balance was over $500. On June 26, 2025, Bank 3 notified CIBanco that it would terminate its contractual relationship with CIBanco and close the accounts due to the Order. CIBanco's accounts at Bank 3 were subsequently closed.

35.     At the time of the Order, CIBanco maintained a bank account at Bank 4 in Texas for correspondent banking purposes and to make certain bond payments. On June 25, 2025, the account's balance was approximately $8,820. On June 25, 2025, Bank 4 advised CIBanco that it would terminate its contractual relationship with CIBanco and close its account due to the Order. CIBanco's account at Bank 4 was subsequently closed.

36.     CIBanco continues to maintain one bank account at Bank 5 in New York for correspondent banking purposes. As of August 12, 2025, the approximate balance in the account at Bank 5 was more than $99 million. While the account remains active at this time for limited purposes, Bank 5 has notified CIBanco that it intends to terminate its relationship with CIBanco and close the account on August 21, 2025 to comply with the Order.

### *Bank Accounts Held by CIBanco as Trustee*

37.     Separate from its correspondent banking accounts, CIBanco maintains dozens of bank accounts inside the United States at U.S. financial institutions as part of its trustee responsibilities, including accounts at approximately ten different U.S. financial institutions.[5] In total, these trust accounts presently hold over $38 million inside the United States.

38.     Since the Order's publication, CIBanco has been unable to access many of these accounts, as U.S. financial institutions begin to comply with the Order prohibiting transmittal of funds to and from CIBanco. Based on the way the trusts are structured, beneficiaries also cannot directly access these trusts, meaning the assets are effectively stranded.

### *Other CIBanco Financial Interests in the United States*

39.     Prior to the Order, CIBanco maintained a partnership with Visa through which Visa agreed to provide key processing services for approximately 220,000 debit and prepaid cash cards issued by CIBanco. As part of this agreement, CIBanco maintained an account in the United States with Visa, through which it made payments to and received payments from Visa. As of June 25, 2025, the balance of this account was approximately $2.7 million.

---

[5] Some of these banks are U.S. arms of foreign-based multinational banks, but the accounts in question are located in the United States.

40.    On June 30, 2025, Visa terminated its relationship with CIBanco based on the Order. Visa's termination caused approximately 150,000 CIBanco-issued Visa prepaid cash cards to stop working for CIBanco customers. Approximately 70,000 additional CIBanco-issued debit cards were blocked by Visa from working abroad.

41.    As discussed above, CIBanco offered customers financial derivative products that customers could use to hedge currency risk. CIBanco's risk policy requires, upon the execution of a financial derivative transaction with a customer, the mitigation of that risk. Prior to the Order, CIBanco hedged the risk by entering into separate derivative contracts with U.S. banks in the United States. As part of those agreements, CIBanco posted tens of millions of dollars of collateral with these U.S. counterparties inside the United States.

42.    In response to the Order, CIBanco's U.S. counterparties unilaterally terminated these contracts prior to their date of maturity and kept CIBanco's funds as collateral, causing significant losses to CIBanco.

## The FEND Off Fentanyl Act and Section 2313a Authority

43.    In April 2024, Congress passed the FEND Off Fentanyl Act,[6] which, among other things, added 21 U.S.C. § 2313a. Section 2313a provides that if the Secretary of the Treasury "determines that reasonable grounds exist for concluding" that a financial institution operating outside of the United States "is of primary money laundering concern in connection with illicit opioid trafficking," the Secretary may, "by order, regulation, or otherwise as permitted by law," require domestic financial institutions and domestic financial agencies to take one or more of six "special measures" against the non-U.S. financial institution that the Secretary has found to be "of primary money laundering concern in connection with illicit opioid trafficking." The statute is

---

[6] The FEND Off Fentanyl Act is Division E of Public Law 118-50 (Apr. 24, 2024).

modeled after and incorporates parts of Section 311 of the USA PATRIOT Act, which granted the Secretary of the Treasury a similar authority (also delegated to FinCEN) for non-U.S. banks of "primary money laundering concern" (without the opioid qualifier).

44.    Section 2313a does not define what constitutes a "primary money laundering concern in connection with illicit opioid trafficking," nor does Section 311 of the USA PATRIOT Act define "primary money laundering concern." But the latter statute does require, and FinCEN adopted in this Order, certain considerations before the imposition of special measures, including:

> (i) the extent to which such financial institutions . . . are used to facilitate or promote money laundering in or through [a particular] jurisdiction, including any money laundering activity by organized criminal groups . . . ;
>
> (ii) the extent to which such institutions . . . are used for legitimate business purposes in the jurisdiction; and
>
> (iii) the extent to which [the special measure] is sufficient to ensure, with respect to . . . institutions operating in the jurisdiction, that the purposes of this subchapter continue to be fulfilled, and to guard against international money laundering and other financial crimes.

31 U.S.C. § 5318A(c)(2)(B).

45.    Section 2313a provides for six possible "special measures," five of which are incorporated from Section 311. 21 U.S.C. § 2313a(a)(1) & (2). The special measures incorporated from Section 311 include (1) enhanced recordkeeping and reporting requirements; (2) compulsory provision of beneficial ownership information on relevant accounts; (3) compulsory reporting of information regarding customers of domestic financial institutions who are permitted to use suspect payable-through accounts; and (4) compulsory reporting of information regarding customers of domestic financial institutions permitted to use suspect correspondent accounts. 31 U.S.C. § 5318A(b)(1)–(4). The fifth special measure allows the Secretary to prohibit or otherwise

restrict domestic financial institutions and agencies from opening or maintaining correspondent accounts for a designated financial institution. § 5318A(b)(5).

46.    In addition to these five "special measures" adopted from Section 311, Section 2313a provides for a sixth "special measure"—to "prohibit, or impose conditions upon, certain transmittals of funds (to be defined by the Secretary) by any domestic financial institution or domestic financial agency, if such transmittal of funds involves any such institution, class of transaction, or type of accounts." 21 U.S.C. § 2313a(a)(2). The most severe outcome authorized by this sixth special measure (the prohibition of any domestic financial institution transacting with the targeted entity) starves the target bank of U.S. dollars and funds from the U.S. financial system; by severing the target bank from the U.S. financial system, it prevents the target bank from engaging in any significant foreign exchange, foreign commerce, or other critical functions of an international commercial bank.

47.    In selecting which special measure to apply, Section 311 provides (and FinCEN adopted in this matter) a series of factors to consider, including:

>   (i) whether similar action has been or is being taken by other nations or multilateral groups;

>   (ii) whether the imposition of any particular special measure would create a significant competitive disadvantage, including any undue cost or burden associated with compliance, for financial institutions organized or licensed in the United States;

>   (iii) the extent to which the action or the timing of the action would have a significant adverse systemic impact on the international payment, clearance, and settlement system, or on legitimate business activities involving the particular jurisdiction, institution, class of transactions, or type of account; and

>   (iv) the effect of the action on United States national security and foreign policy.

31 U.S.C. § 5318A(a)(4)(B).

48.     Section 311 allows the first four special measures to "be imposed by regulation, order, or otherwise as permitted by law." § 5318A(a)(2)(B). The fifth special measure—the correspondent banking authority—is only permitted through regulation, § 5318A(a)(2)(C), thereby triggering the notice-and-comment rulemaking requirements of the Administrative Procedure Act, 5 U.S.C. § 553. Section 2313a, however, provides that the new sixth special measure, which allows for a range of possible constraints on the target institution, including and up to prohibition, may be imposed "by order, regulation, or otherwise as permitted by law." 21 U.S.C. § 2313(a).

**FinCEN's Issuance of the Order**

49.     On June 25, 2025, with no prior notice to the Bank, FinCEN publicly announced that it had issued orders imposing the sixth "special measure" and prohibiting U.S. financial institutions from engaging in the transmittal of funds involving CIBanco and two other Mexico-based banks. Press Release, Financial Crimes Enforcement Network, "Treasury Issues Unprecedented Orders Under Powerful New Authority to Counter Fentanyl" (June 25, 2025), https://www.fincen.gov/news/news-releases/treasury-issues-unprecedented-orders-under-powerful-new-authority-counter. The press release issued by FinCEN acknowledged the orders were "unprecedented." *Id.*

50.     The Order, which was formally published in the Federal Register on June 30, 2025, states that "reasonable grounds exist to conclude" that CIBanco is of "primary money laundering concern in connection with illicit opioid trafficking." 90 Fed. Reg. 27770, 27771.

51.     The Order alleges that CIBanco engaged in the "provision of financial services that facilitate illicit opioid trafficking by Mexico-based drug trafficking organizations (DTOs), including (1) the Gulf Cartel, (2) the Beltran-Leyva Organization (BLO) Cartel, and (3) Jalisco New Generation Cartel (CJNG)." 90 Fed. Reg. 27770. However, most of the Order's factual

discussion surrounding these cartels and their trafficking activities have nothing to do with CIBanco. Indeed, there are only two vague allegations directly connecting these DTOs and CIBanco:

      A.     The Order alleges that "in the beginning half of 2023, a CIBanco employee knowingly facilitated the creation of an account to purportedly launder USD 10 million on behalf of a Gulf Cartel member." 90 Fed. Reg. 27770, 27772. The Order does not allege money actually moved through CIBanco—only that an account purportedly was created. The Order also does not provide the alleged employee's name or any other details that would allow the Bank to identify who may have been involved. CIBanco cannot find any data matching this purported event or transactions that would match the description in this allegation. FinCEN has refused to provide any additional details despite CIBanco's repeated requests for additional information.

      B.     The Order alleges that "between August and September 2024, Mexico-based money brokers working on behalf of BLO Cartel and CJNG coordinated the movement of up to the equivalent of USD 26,000 in illicit funds to CIBanco." 90 Fed. Reg. 27770, 27773. The Order does not provide any additional details about where these individuals were located; what accounts were involved; what knowledge, if any, CIBanco had; or any other details. CIBanco cannot find any data matching this purported event or transactions that would match the description in this allegation. FinCEN has refused to provide any additional details despite CIBanco's repeated requests for additional information.

52.    Despite their vagueness, those allegations at least allege some connection between CIBanco and the movement of illicit cartel funds. The rest of the Order makes far afield allegations that, on their face, have no connection to opioid trafficking by the cartels.

53.    The remaining allegations purport to focus on CIBanco's alleged role in the purchase of precursor chemicals, which the Order notes are "sourced largely from the People's Republic of China (China)," 90 Fed. Reg. 27770, 27771, and are used to produce illicit opioids. The Order claims that the following allegations support the conclusion that CIBanco has facilitated "USD transactions that finance the importation of precursor chemicals used to produce illicit synthetic opioids on behalf of DTOs." 90 Fed. Reg. 27770,  27773. The specific allegations in the Order, however, are cursory, bereft of details, and involve daisy chains of illogical connections:

A.    **Mexico Company 1**: The Order says that "[f]rom 2012 through 2018, Mexico and U.S. law enforcement seized at least four shipments associated with a Mexico-based company that contained precursor chemicals or illicit drugs including methamphetamine." 90 Fed. Reg. 27770, 27773. There is no allegation that CIBanco had any knowledge of, or involvement in these events. The only alleged connection between the Mexico-based company and CIBanco is that "[f]rom 2016 through 2024, this Mexico-based company sent over 40 wires totaling over USD 200,000 to shipping companies based in countries including Japan and South Korea through CIBanco." 90 Fed. Reg. 27770, 27773. The Order does not provide any basis to connect the 40 wires involving CIBanco to companies in Japan and South Korea to purported precursor facilitation through China.[7] The Order does not name the company, its industry, the

---

[7] The Order also does not explain the relevance of methamphetamine seizures to its determination, given that FinCEN has issued the order pursuant to its illicit opioids authority (methamphetamine, while a potentially deadly narcotic, is not an opioid).

accounts involved, or any other details about how these transactions are in any way connected to opioid trafficking. CIBanco has not been able to identify this purported company or transactions matching the description in this allegation, and FinCEN refused to provide any additional details or information about this allegation.

B.    **Mexico Company 2**: The Order says that "[i]n mid-2019, a CJNG precursor chemical broker facilitated an order of dimethyl carbonate from a China-based chemical supplier to a second Mexico-based company."[8] 90 Fed. Reg. 27770, 27773. There is no allegation that CIBanco had any knowledge whatsoever of this 2019 facilitation. The only allegation set out in the Order about CIBanco and this second Mexico-based company is that, from 2022 through 2024, CIBanco "was associated with more than 150 funds transfers totaling over USD 100 million involving industrial companies based in countries including Taiwan and Switzerland." 90 Fed. Reg. 27770, 27773. Again, the Order does not provide any basis to connect these funds transfers involving industrial companies in Switzerland and Taiwan with opioid trafficking through the purchase of precursor chemicals from China.[9] Numerous industrial companies engaged in legitimate commerce are based in Switzerland and Taiwan. The Order does not provide any other details, such as the name of the Mexico-based company, its industry, or any other information. CIBanco has not been able to identify this purported company or transactions that would match the description in this

---

[8] The Order does not make any connection between dimethyl carbonate and opioid production. Dimethyl carbonate is not a regulated precursor, and, according to public sources, it is an extremely common chemical used in the production of, among other things, lithium batteries, coatings, adhesives, and fuel additives.

[9] The Order's use of the word "China" is solely to the People's Republic of China, 90 Fed. Reg. 27770, 27771, and is not defined to include Taiwan (formally the "Republic of China").

allegation, and FinCEN refused to provide any additional details or information about this allegation.

C.      **Mexico Company 3**: The Order also states that in late 2019, Germany- and China-based precursor chemical brokers "likely" facilitated a shipment of hydroxylamine hydrochloride through a third Mexico-based company for a CJNG-affiliated precursor chemical broker. 90 Fed. Reg. 27770, 27773–74. Again, there is no allegation that any of this information was known, or should have been known, to CIBanco. The alleged connection between CIBanco and this third Mexico-based company is simply that, from 2016 through 2022, this third Mexico-based company "sent over 150 funds transfers totaling over USD 130,000 to industrial companies in the U.S. and Mexico through CIBanco." 90 Fed. Reg. 27770, 27774. There are no further allegations or information provided about the identities of the industrial companies, or how, if at all, they are involved in opioid trafficking through the purchase of precursor chemicals from China. All FinCEN states, conclusorily, is that it has assessed these funds transfers "were likely in tandem with illicit opioid trafficking operations." 90 Fed. Reg. 27770, 27774. CIBanco has not been able to identify this purported company or transactions that would match the description in this allegation, and FinCEN refused to provide any additional details or information about this allegation.

D.      **3 Chinese Companies:** Finally, the Order alleges that three unnamed companies located in China were "known to have shipped precursor chemicals to Mexico for illicit purposes." 90 Fed. Reg. 27770, 27774. Again, the Order makes no allegation that any of this information was known, or should have been known, to

CIBanco. The only connection between CIBanco and these three Chinese companies is that the companies received funds totaling $2.135 million via 30 transfers through unnamed CIBanco accounts between December 2021 and October 2024. 90 Fed. Reg. 27770, 27774. The Order provides no information about the identities of the companies that transferred these funds; whether they were complicit in illicit opioid trafficking; the knowledge or warnings, if any, CIBanco had about the illicit activity; or any other such information. CIBanco has not been able to identify these purported companies or transactions that would match the description in this allegation, and FinCEN refused to provide any additional details or information about this allegation.

54.     After setting forth this thin and opaque record, the Order then considers the other factors to determine whether CIBanco is a "primary money laundering concern in connection with illicit opioid activity" and, if so, which of enumerated special measures is appropriate to impose.

55.     The Order considers the extent to which CIBanco is used for legitimate business purposes, in order to assess whether the Bank was in fact a primary money laundering concern. 90 Fed. Reg. 27770, 27774. In its supposed consideration of this factor, however, the Order singularly focuses on CIBanco's total assets ($7 billion) and concludes, in effect, that because the Bank is "only" the 20th largest financial institution in Mexico, its conduct is suspect. The Order, however, does not address CIBanco's actual *activity*—the number of clearly legitimate transactions it completes a day, its number of customers, and the other services it provides customers. The Order similarly engages in no comparison of the scale of the alleged illicit activity to the Bank's legitimate business activity. Likewise, the Order makes no mention of the over $60 billion of trust assets that CIBanco oversees, including over $40 billion of assets held in trust for U.S. companies

and persons; and gives no consideration to its loan business, its derivative business, or other lines of business not implicated by the Order's allegations.

56.    The Order also engages in no review of CIBanco's controls, AML compliance program, or other mitigating factors to demonstrate the lack of intent to facilitate any transactions to violate the law (if the alleged transactions even qualify as those involved in the facilitation of illicit opioid trafficking). The Order instead merely claims that no such review of AML policies was necessary based on "the evidence described in this Order and the totality of the circumstances." 90 Fed. Reg. 27770, 27774.

57.    Turning to the question of which special measure would be appropriate for CIBanco, the Order recites the relevant factors identified in 31 U.S.C. § 5318A(a)(4)(B) and states, without analysis, that FinCEN had considered them. When discussing the extent to which the action "could have a significant adverse systemic impact on legitimate business activities involving CIBanco," the Order again focuses on one metric—the $7 billion in assets[10]—without actually considering what the legitimate business activities were, the disruption that its thousands of customers would experience, the risk of $40 billion in assets held for U.S. beneficiaries being stranded, the penalties for U.S. investors for defaulting on their obligations related to the trusts or losses to them overall, or any of the other ramifications that imposition of the sixth special measure would have. Indeed, the Order concludes that "the legitimate business services that [CIBanco] offers would be readily available through other regulated institutions," 90 Fed. Reg. 27770, 27775, without articulating what a single one of those services are.

---

[10] The $7.04 billion figure does not include any of the more than $60 billion in assets that CIBanco is responsible for as part of its trustee duties. Those assets do not belong to the bank itself and so are accounted for properly off of CIBanco's balance sheet.

58.    Likewise, when considering whether any of the first five special measures would be more appropriate here, the Order does not articulate any clear basis consistent with the statute. The first four special measures, the Order concludes, would be insufficient because they "would allow such transfers to continue to the benefit of illicit actors connected to illicit opioid trafficking," 90 Fed. Reg. 27770, 27776, without further explanation. It appears that FinCEN concluded that the first four special measures would *never* be sufficient for a "primary money laundering concern in connection with illicit opioid trafficking," because there is some risk that an opioid trafficker could use the foreign bank again. That clearly runs counter to the statutory scheme, which contemplates that the other measures would be appropriate in some circumstances. The Order offers no limiting principle, in part because FinCEN elected not to evaluate CIBanco's AML program and other controls.

59.    The Order does not even acknowledge or address the less restrictive imposition of conditions short of prohibition set forth in the sixth special measure, let alone why they, too, are insufficient. For example, it does not discuss why FinCEN could not just impose conditions on the transmittal of funds, as opposed to a full ban, or why FinCEN could not allow some category of funds to be processed by U.S. financial institutions.

60.    Finally, the Order explains why FinCEN had elected to proceed directly via order, instead of by regulation that would trigger notice-and-comment rulemaking (and afford CIBanco an opportunity to understand the evidence, correct misunderstandings, and be heard). Besides describing the "imminent threats posed by the illicit actors" (presumably the cartels), the Order cites the "ongoing transactions associated with suspected activity related to illicit opioid trafficking that continue to be processed through CIBanco." 90 Fed. Reg. 27770, 27776. But the Order *never* alleges or describes ongoing transactions of concern, and none of the allegations involve conduct

in 2025 that would support the heightened need to forego traditional due process provisions afforded through rulemaking.

61.     The Order ends with what is clearly a preordained outcome: a directive to all domestic financial institutions prohibiting them from engaging in any transmittal of funds from or to CIBanco. 90 Fed. Reg. 27770, 27776.

## CIBanco's Submissions to and Engagement with FinCEN

62.     Immediately after learning of the Order, CIBanco began to contact the Treasury Department, FinCEN, and other government officials to understand the allegations and evidence on which FinCEN relied, as well as to seek an appropriate opportunity to be heard. CIBanco was denied on both fronts.

63.     On July 2, 2025, CIBanco made multiple submissions to FinCEN. It explained the Bank's unwavering support for the Administration's fight against the cartels and its own commitment to policing the Bank against misuse by cartels and illicit opioid trafficking actors. CIBanco submitted an explanation of its AML and financial crimes compliance programs, including exhibits describing its programs and prior assessments by outside U.S compliance experts like K2 Integrity.

64.     On July 2, 2025, CIBanco also separately submitted information about CIBanco's trust services business. CIBanco warned that the Order placed the continued viability of CIBanco's trust services business in jeopardy and generated systemic risks given CIBanco's prominent role in the administration of Mexican trusts, including trusts that serve U.S. interests. It also explained how the trust services operation will cease to function if the Order goes into effect.

### CIBanco's Repeated and Unsuccessful Requests for Meaningful Specifics

65.     Since the Order was published, CIBanco has desperately tried to use the sparse and vague information in the Order to see if it can identify what customers and transactions FinCEN might have focused on. But for a commercial bank of CIBanco's size, this is not just looking for needles in haystacks—it is looking for needles in hayfields. For reference, between December 2021 and October 2024 (the period in which the 30 transactions totaling $2.135 million allegedly occurred), CIBanco processed approximately 57,276 transactions to China—one of Mexico's largest trading partners—on behalf of 2,275 customers totaling over $2.39 billion.

66.     Given the Order's lack of specificity, CIBanco has repeatedly requested that FinCEN and the Treasury Department provide the unclassified information on which FinCEN relied, thereby allowing CIBanco, in conjunction with its auditors and forensic accounting teams, to properly investigate the Order's allegations and findings. On June 30, 2025, CIBanco met with officials from the Treasury Department and requested additional information about the allegations in the Order so it could investigate.

67.     On July 2, 2025, after repeating the request during a videoconference with Director Gacki and FinCEN representatives, CIBanco's counsel followed up with a letter to FinCEN requesting further details about the alleged accounts and transactions, including (a) the name of the CIBanco employee who allegedly opened an account for the Gulf Cartel member, and the account information in question; (b) account details connected to the $26,000 allegedly transmitted through CIBanco by cartel-linked money brokers; (c) the names of the three Mexico-based companies discussed in the Order and details about the suspected transactions; and (d) the names of the three China-based companies and details about the suspected transactions. FinCEN did not respond to the letter and did not provide any of the requested information.

68.    On July 8, 2025, CIBanco's counsel submitted another letter, repeating the informational request to FinCEN so that the Bank could properly investigate the allegations in the Order, and respond in full. Since then, CIBanco's representatives have repeated their informational request in subsequent meetings with officials from FinCEN and the Treasury Department. FinCEN and Treasury officials have yet to provide any information, instead claiming at one point that the Bank should have enough information to identify these allegations.

### CIBanco Is Being Cut Off from the U.S. Financial System

69.    The Order prohibits any U.S. financial institution "from engaging in any transmittal of funds from or to CIBanco." 90 Fed. Reg. 27770, 27776. The Order defines "transmittals of funds" broadly to include the sending and receiving of funds, including convertible virtual currency. 90 Fed. Reg. 27770, 27776. In short, the Order prohibits any U.S. bank from engaging in any type of financial transaction with CIBanco, either directly or through a financial intermediary. For a bank so fundamentally involved in currency exchanges and the administration of tens of billions of dollars in assets held in trust for U.S. interests, the Bank stands little chance of surviving the Order in its current form (assuming regulators do not liquidate or sell the Bank first).

70.    As noted above, CIBanco's U.S. correspondent banks have terminated or are in the process of terminating their relationships with CIBanco due to the Order. CIBanco's operational bank accounts held in the United States are being shut down. Without suspension of the Order, CIBanco will lose access to its final correspondent bank account on August 21, 2025.

71.    CIBanco is also being prevented from accessing U.S. bank accounts held by CIBanco as trustee, as companies comply with the Order. Due to the nature of the accounts, trust

beneficiaries cannot easily access those assets without CIBanco's involvement, meaning the assets in those accounts are being stranded.

72.     Immediately following the publication of the Order, other U.S. financial services began to end their contractual relationships with CIBanco in anticipation of the Order going into effect. As noted above, Visa terminated its contractual partnership with CIBanco shortly after the Order was announced, impacting approximately 220,000 Bank-issued debit and prepaid cash cards. Likewise, U.S. counterparties to derivative transactions are breaking their contracts due to the Order and keeping millions of dollars in collateral posted by CIBanco.

73.     The Bank is suffering serious reputational damage from the allegations. For example, non-U.S. banks with their own correspondent banking relationships with U.S. banks are exiting from their relationships with CIBanco, out of fear of violating the Order or being themselves similarly targeted by U.S. authorities.

74.     The pressure of the Order is severely impairing the Bank's performance. Since the month following the Order, foreign exchange revenues have fallen by more than 90%; CIBanco has also lost more than 40% of total deposits as customers assess the long-term viability of the Bank. These losses will likely soon be irreversible.

## Mexican Regulators Are Poised to Dismantle the Bank

75.     The Mexican government has publicly stated that, like CIBanco, it has not received any additional information that corroborates FinCEN's allegations that CIBanco is a primary money laundering concern in connection with illicit opioid trafficking. Mexican President Claudia Sheinbaum publicly stated that the government had received "no evidence" to support FinCEN's

allegations.[11] A June 25, 2025 press release by Mexico's bank regulator stated that, "[t]he Department of the Treasury was requested to provide evidence of the link between these institutions and illicit activities that could be corroborated . . . however, no probative information in this regard was received."[12] Nevertheless, the sudden and unexpected actions by FinCEN—and FinCEN's apparent oversight of the Bank's operations—have forced the Mexican government to try to intercede. This is causing even more harm to CIBanco and accelerates the chances it ends all operations.

76.    Driven by worries about the systemic risk to CIBanco's trust division, on July 4, 2025, the Mexican Finance Ministry issued a statement announcing that it had begun the process to seize CIBanco's trust division and temporarily transfer it to the Mexican development bank entities. The Finance Ministry said it would then look for a permanent solution to transfer the trusts over to different private institutions.

77.    Removing CIBanco's trust division will cause the Bank irreparable harm, depriving it of a significant revenue source and a business unit recently valued at approximately $400 million. Moreover, even a well-intentioned effort to extract the trust division under these constrained time periods and without any preplanning—a battlefield operation to extract and transfer $60 billion of assets—significantly risks losses to the beneficiaries of those trusts. All trusts will require a comprehensive migration of accounts, contracts, accounting records, policies, cash flows, physical and digital files, licenses, operational platforms (including CIBanco's proprietary software used to

---

[11] Noe Torres & Emily Green, "Mexican Regulator Takes Over Running of Banks Hit by US Fentanyl Sanctions," Reuters (June 26, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/mexican-regulator-takes-over-running-banks-hit-by-us-fentanyl-sanctions-2025-06-26/.

[12] Press Release, Hacienda, "Nota Informativa Sobre Investigaciones En El Sector Financiero" (June 25, 2025),  https://www.gob.mx/shcp/prensa/295579.

manage the trust division), qualified and well-trained personnel, and assets. All require specialized technical, legal, and accounting oversight, and mistakes will lead to discrepancies in the reconciliation of assets, missed payments and distributions, and other significant issues. Mexican law also requires approvals, notice, and opportunities to object. CIBanco estimates it should take five-to-six months to implement a transfer of trusts to government-controlled banks, time that is not available under the current Order.

**Thousands of Innocent Third Parties Face Harm**

78.    Beyond wreaking havoc on CIBanco itself, the Order will injure many others who depend on the Bank. Individuals with deposits at the Bank face substantial risk of losses in a liquidation. Numerous U.S. investors, including state and local employees, such as teachers and first responders, will suffer losses from the upheaval of the trust division's management of pension funds, investment funds, and other trusts, and separately risk being stranded from assets held in trust for their benefit. And many of the more than 3,000 employees of the Bank will be terminated when the Bank is forced to cease its international commercial operations and shutter or drastically downsize.

**CIBanco's Efforts to Avoid the Need for Litigation**

79.    In repeated correspondence and meetings, CIBanco has sought to avoid litigation in hopes of demonstrating to the government that it is a trustworthy and committed partner in the fight against the cartels. On July 2, 2025, and again on July 8, 2025, CIBanco's counsel asked FinCEN to lift the Order or, in the alternative, to extend the Order's effective date by an additional 180 days to allow a more thorough analysis of the allegations and good faith dialogue between the parties, and for the benefit of all parties, including the thousands of stakeholders in the U.S. and Mexico. On July 30, 2025, CIBanco's counsel met with FinCEN to again propose a cooperative

path forward, proposing a 180-day extension of the Order's effective date with a public statement by FinCEN that the parties are cooperating and working towards an agreement that would allow the Bank to continue to operate, which might obviate need for litigation or preliminary relief. During that period, CIBanco offered to submit to a review of its compliance programs and any other operations of the Bank that FinCEN wished to examine and to discuss additional, less severe measures, including the use of an independent auditor paid for by the Bank, that would allay FinCEN's concerns about CIBanco.

80.     FinCEN has not responded to the Bank's proposal or engaged on any extension beyond September 4, 2025, necessitating CIBanco to file the present Complaint.

## Count I – Administrative Procedure Act

### (Order Is Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance with Law)

81.     CIBanco repeats, re-alleges, and incorporates the allegations in the preceding paragraphs.

82.     The Administrative Procedure Act prohibits agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

83.     An agency regulation is arbitrary and capricious if (among other things) the agency (1) failed to examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made; (2) failed to consider an important aspect of the problem; (3) offered an explanation for its decision that runs counter to the evidence before it; and/or (4) defies the text of a statute or reflects an unreasonable interpretation thereof.

84.     In this case, FinCEN failed to articulate a rational connection between the facts and the conclusion and failed to account for the contrary evidence before it. The Order discusses

transactions allegedly facilitated via CIBanco accounts to Switzerland, Japan, South Korea, and Taiwan—but gives no explanation as to how those transactions were connected to illicit opioid trafficking. Likewise, the Order has no discussion of CIBanco's knowledge of any of these transactions—what, if any, red flags were missed, whether CIBanco was complicit, or any similar information.

85.     FinCEN also failed to reasonably articulate why CIBanco is a "primary" money laundering concern in connection with illicit opioid trafficking. Nothing in the Order indicates that CIBanco is a primary concern to the Treasury Secretary or is worse than other foreign financial institutions. Branding CIBanco a "primary" money laundering concern on this record renders the term meaningless, and therefore also defies the text of a statute or reflects an unreasonable interpretation of that term.

86.     In evaluating whether CIBanco is used for legitimate business activity and the extent to which innocent persons may be hurt by prohibiting the transmittal of funds, FinCEN also failed to consider important facts and failed to account for the contrary evidence before it. The record leaves no doubt that the overwhelming number of the Bank's transactions are legitimate, a point FinCEN does not consider. FinCEN also failed to consider that CIBanco operates significant business lines that are not implicated in the Order. The Order improperly ignores the fact that CIBanco operates Mexico's largest trust division, with responsibility for over $40 billion in foreign assets held for U.S. beneficiaries, as well as CIBanco's loan business and derivatives business. None of this was considered when FinCEN evaluated the extent to which the action could have a significant adverse systemic impact on legitimate business activities involving CIBanco.

87.     FinCEN also imposed an excessive and disproportionate penalty while failing to consider obvious alternatives that would adequately address the money laundering concern.

FinCEN did not consider, for example, whether imposition of an independent monitor or other controls would address the concerns it identified. Likewise, even within the sixth special measure, FinCEN did not consider whether something less than a full ban on all fund transmittals to and from CIBanco would address the concerns. FinCEN did not consider, for example, whether imposing conditions on certain transmittals (e.g., prohibiting CIBanco from transmitting funds to China) would be sufficient to address its concerns, or whether permitting domestic U.S. institutions to transmit certain types of funds to and from CIBanco (e.g., in connection with trust administration) would have been a sufficient alternative.

88.    FinCEN has imposed lesser penalties against financial institutions that have engaged in conduct far worse than anything alleged against CIBanco. Yet the Order contains no discussion of why any of the sanctions used in those cases would be inadequate here. Nor does it explain why imposing the most extreme form of the sixth special measure is an appropriate and proportional response considering the facts of this case and how FinCEN has treated similarly situated parties. An agency action that imposes an excessive and disproportionate penalty is arbitrary and capricious, as agency action that fails to consider obvious alternatives.

89.    FinCEN also failed to give a satisfactory explanation for its decision to forgo exercising its authority by regulation, as opposed to Order. Given the clear oversights in the Order and inadequate discussion and details in the text, FinCEN clearly lacked the proper administrative record to make a reasoned decision. FinCEN's articulation for proceeding by Order, in turn, is that "ongoing transactions associated with suspected activity related to illicit opioid trafficking [] continue to be processed through CIBanco," 90 Fed. Reg. 27770, 27776, but the Order never explains its basis for this language (which appears to have been cut-and-pasted from other orders issued on the same day).

90.     For these reasons, the Order is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, all in violation of the Administrative Procedure Act.

## Count II – Due Process

### (Failure to Provide Notice and a Hearing)

91.     CIBanco repeats, re-alleges, and incorporates the allegations in the preceding paragraphs.

92.     The Due Process Clause of the Fifth Amendment guarantees that "no person shall . . . be deprived of life, liberty, or property, without due process of law." At its core, due process promises both effective notice and a meaningful opportunity to be heard.

93.     Notice of a deprivation of property must convey sufficient information for interested parties to have an opportunity to present their objections. In other words, due process requires that a party facing deprivation of its property be given notice of the case against it.

94.     The opportunity to be heard must (barring exceptional circumstances not present here) occur *before* the deprivation. And, at a minimum, a party being deprived of property must have a meaningful opportunity to present its case to a neutral decisionmaker.

95.     The Order, when it goes into effect on September 4, 2025, will fully deprive CIBanco of a property interest by blocking its ability to maintain bank and similar accounts inside the United States, and will prevent it from accessing funds currently held on the Bank's behalf in bank accounts within the United States. CIBanco has already been deprived of many property interests, as U.S. financial institutions terminate their relationships to comply with the Order.

96.     Through the Order, CIBanco has also been unlawfully deprived of other protected property and liberty interests, including those stemming from contractual agreements with U.S.

counterparties. It has also suffered serious harm to its reputational interest from the Order, which has prompted investors and counterparties to flee the Bank.

97.     Defendants have refused to provide effective notice of this deprivation. In the Order, FinCEN cites "CIBanco's longstanding facilitation of illicit opioid trafficking by Mexico-based DTOs," 90 Fed. Reg. 27770, 27776, but every specific factual allegation is written in terms so vague that CIBanco can neither investigate nor refute it. The Bank has repeatedly requested that FinCEN provide specifics of the accusations against it—such as names, dates, account numbers, or other information that would enable the Bank to identify the alleged misconduct—but FinCEN refused to supply them. FinCEN also never shared the supposed evidence underlying these allegations, despite requests. Without such information, CIBanco lacked proper, requisite notice of the case against it.

98.     FinCEN has also failed to provide a meaningful opportunity to be heard. CIBanco was not aware at all of the contemplated government action at any time prior to the issuance of the Order or given any meaningful opportunity to be heard before the Order was issued. Since the Order's issuance, the Bank has not been offered or provided any hearing, much less a hearing before a neutral arbiter, or the requested information needed to defend against the vague allegations in the Order.

99.     For these reasons, the Order, weeks prior to it going into effect on September 4, 2025, will deprive, and is depriving, CIBanco of its property and liberty interests without due process of law, in violation of the Due Process Clause of the Fifth Amendment.

**Prayer for Relief**

Wherefore, Plaintiff CIBanco respectfully requests that this Court declare that the Order is unlawful and unconstitutional, and award any other relief the Court deems necessary and just, including as appropriate using its equitable powers to enter orders providing:

    A.  The Order is preliminarily enjoined until the Court enters a final judgment in this case;

    B.  The Order is permanently enjoined as unlawful and invalid;

    C. Defendants are enjoined from implementing or giving effect to the Order in any way;

    D. Defendants are directed to rescind any and all statements, guidance, or direction that has already issued that relates to announcing, implementing, or enforcing the Order, including Frequently Asked Questions, as they pertain to CIBanco; and

    E. An award of costs and attorneys' fees under any applicable statute or authority.

Dated: August 17, 2025

Respectfully submitted,

**DUNN ISSACSON RHEE LLP**

*/s/ Jeannie S. Rhee*
Jeannie S. Rhee (D.C. Bar No. 464127)
L. Rush Atkinson* (D.C. Bar No. 90025313)
Jenifer N. Hartley**
401 9th Street, NW
Washington, DC 20004
(202) 240-2900
jrhee@dirllp.com
ratkinson@dirllp.com
jhartley@dirllp.com

*Pro hac vice application forthcoming.*
**Admitted in NY only; practice supervised by members of D.C. Bar. Pro hac vice application forthcoming.*

**ARKTOUROS PLLC**

Kenneth A. Blanco*
One Biscayne Tower
Two Biscayne Blvd
Suite 1600
Miami, FL 33131
kenneth@arktouros.co