**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CIBANCO S.A., INSTITUCIÓN DE BANCA MULTIPLE,**<br><br>Plaintiff,<br><br>v.<br><br>**SCOTT BESSENT**, in his official capacity as Secretary of the Treasury;<br><br>**U.S. DEPARTMENT OF THE TREASURY**;<br><br>**ANDREA GACKI**, in her official capacity as Director of the Financial Crimes Enforcement Network; and<br><br>**FINANCIAL CRIMES ENFORCEMENT NETWORK**,<br><br>Defendants. | Case No. 1:25-cv-02705 |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER**

## TABLE OF CONTENTS

INTRODUCTION .......... 1

BACKGROUND .......... 2

I. CIBANCO'S BUSINESS .......... 2

A. CIBanco's U.S. Fund Transmittals and Correspondent Banks .......... 6

B. U.S. Presence and Property .......... 8

II. THE FEND OFF FENTANYL ACT AND SECTION 2313A AUTHORITY .......... 10

III. FINCEN'S UNEXPECTED ORDER AGAINST CIBANCO .......... 11

IV. FINCEN REFUSED TO EXPLAIN ITS ORDER OR PROVIDE THE INFORMATION ON WHICH IT RELIED .......... 16

V. FINCEN'S ORDER IS CRIPPLING THE BANK .......... 18

LEGAL STANDARD AND REVIEWABILITY .......... 21

ARGUMENT .......... 22

I. CIBANCO IS LIKELY TO PREVAIL ON THE MERITS OF ITS APA AND CONSTITUTIONAL DUE PROCESS CLAIMS. .......... 23

A. Plaintiff Is Likely to Succeed on the Merits of Its Claim that the Designation Was Arbitrary, Capricious, and Contrary to Law in Violation of the APA. .......... 23

1. Cited Evidence Does Not Support the Conclusion that CIBanco Facilitated Illicit Opioid Trafficking .......... 24

2. FinCEN Failed to Consider Critical Relevant Information by Ignoring the Scale of CIBanco's Overwhelmingly Legitimate Activities. .......... 27

3. FinCEN Failed to Consider Any of the Significant, Viable, or Obvious Alternative Options that Would Address the Problem It Identified. .......... 28

B. The Government Violated the Fifth Amendment's Guarantee of Due Process by Denying CIBanco Notice and a Meaningful Opportunity to Be Heard. .......... 31

1. FinCEN's Order Deprives CIBanco of Its Protected Liberty and Property Interests. .......... 32

a. Access to U.S. Bank Accounts. .......... 32

b. Protected Contractual Relationships. .......... 33

c. Reputational Interest. .......... 34

2. FinCEN Did Not Give Any Advance Notice of Its Action, and CIBanco Was Therefore Deprived of Any Opportunity to Be Heard. .......... 36

II. CIBANCO WILL SUFFER IRREPARABLE HARM WITHOUT IMMEDIATE INJUNCTIVE RELIEF. .......... 40

III. THE BALANCE OF THE EQUITIES STRONGLY FAVORS CIBANCO AND A TEMPORARY RESTRAINING ORDER SERVES THE PUBLIC INTEREST. .......... 43

IV. CIBANCO SHOULD NOT BE REQUIRED TO POST THE PAYMENT OF A BOND. .......... 44

CONCLUSION .......... 45

## TABLE OF AUTHORITIES

**Cases**

*Aamer v. Obama*,
742 F.3d 1023 (D.C. Cir. 2014) ........ 21, 22

*Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*,
686 F.3d 965 (9th Cir. 2012) ........ 37

*Am. Ass'n of Political Consultants v. SBA*,
613 F. Supp. 3d 360 (D.D.C. 2020) ........ 43

*Am. First Legal Found. v. Becerra*,
2024 WL 3741402 (D.D.C. Aug. 9, 2024) ........ 44

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*,
897 F.3d 314 (D.C. Cir. 2018) ........ 40

*Atherton v. D.C. Off. of Mayor*,
567 F.3d 672 (D.C. Cir. 2009) ........ 36

*Atlas Air, Inc. v. Int'l Brotherhood of Teamsters*,
280 F. Supp. 3d 59 (D.D.C. 2017),
*aff'd*, 928 F.3d 1102 (D.C. Cir. 2019) ........ 42

*Bd. of Regents of State Colls. v. Roth*,
408 U.S. 564 (1972) ........ 32

*Brendsel v. Office of Fed. Housing Enter. Oversight*,
339 F. Supp. 2d 52 (D.D.C. 2004) ........ 41

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. Fed. Deposit Ins. Corp.*,
132 F. Supp. 3d 98 (D.D.C. 2015) ........ 33

*Contra Lopez Bello v. Gacki*,
94 F.4th 1067 (D.C. Cir. 2024) ........ 39

*Costa v. Bazron*,
456 F. Supp. 3d 126 (D.D.C. 2020) ........ 20

*Dickinson v. Zurko*,
527 U.S. 150 (1999) ........ 23

*Dist. Hosp. Partners, LP v. Burwell*,
786 F.3d 46 (D.C. Cir. 2015) ........ 1, 28

*Eli Lilly & Co. v. Cochran*,
526 F. Supp. 3d 393 (S.D. Ind. 2021) .......... 42

**Fares v. Smith*,
901 F.3d 315 (D.C. Cir. 2018) .......... 36, 37, 38

*FBME Bank Ltd. v. Lew* (*FBME I*),
125 F. Supp. 3d 109 (D.D.C. 2015) .......... 30

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*,
636 F.2d 755 (D.C. Cir. 1980) .......... 44

*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013) .......... 40

*Greene v. McElroy,*
360 U.S. 474 (1959) .......... 34

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., Local 737 v. Auto Glass Emps. Fed. Credit Union*,
72 F.3d 1243 (6th Cir.1996) .......... 34

*Invenergy Renewables LLC v. United States*,
422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019),
*as modified*, 476 F. Supp. 3d 1323 (2020) .......... 42

*ITServe All. Inc. v. Scalia*,
2020 WL 7074391 (D.N.J. 2020) .......... 42

*Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020) .......... 44

*Kartseva v. Dep't of State*,
37 F.3d 1524 (D.C. Cir. 1994) .......... 35

*League of Women Voters of United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .......... 21, 43

*Learning Resources, Inc. v. Trump*,
__ F. Supp. 3d __, 2025 WL 152376 (D.D.C. May 29, 2025) .......... 40

**Luokong Tech. Corp. v. Dep't of Def.*,
538 F. Supp. 3d 174 (D.D.C. 2021) .......... 26, 40, 42

*Mann v. Wash. Metro. Area Transit Auth.*,
185 F. Supp. 3d 189 (D.D.C. 2016) .......... 41

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989) ........ 23

*Mathews v. Eldridge*,
424 U.S. 319 (1976) ........ 36

*Minney v. U.S. Off. of Personnel Mgmt.*,
130 F. Supp. 3d 225 (D.D.C. 2015) ........ 43

**Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........ 23, 26, 27

*N. Mariana Islands v. United States*,
686 F. Supp. 2d 7 (D.D.C. 2009) ........ 42, 43

*Nalco Co. v. U.S. EPA*,
786 F. Supp. 2d 177 (D.D.C. 2011) ........ 41

**Nat'l Council of Resistance of Iran v. Dep't of State*,
251 F.3d 192 (D.C. Cir. 2001) ........ 32, 33, 38

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
538 U.S. 803 (2003) ........ 21

*Nat'l Shooting Sports Found., Inc. v. Jones*,
716 F.3d 200 (D.C. Cir. 2013) ........ 28

*Nken v. Holder*,
556 U.S. 418 (2009) ........ 21, 43

*Old Dominion Dairy Prods. Inc. v. Sec'y of Def.*,
631 F.2d 953 (D.C. Cir. 1980) ........ 35

*P.J.E.S. ex rel. Francisco v. Wolf*,
502 F. Supp. 3d 492 (D.D.C. 2020) ........ 43

*Panthers v. Schweike*r,
652 F.2d 146 (D.C. Cir. 1980) ........ 38

*People's Mojahedin Org. of Iran v. U.S. Dep't of State*,
613 F.3d 220 (D.C. Cir. 2010) ........ 38

*Propert v. District of Columbia*,
948 F.2d 1327 (D.C. Cir. 1991) ........ 39

*Pursuing America's Greatness v. F.E.C.*,
831 F.3d 500 (D.C. Cir. 2016) ........ 21

*Ralls Corp. v. CFIUS*,
758 F.3d 296 (D.C. Cir. 2014) .......... 31, 33, 36, 38

*Regeneron Pharms., Inc. v. U.S. Dep't of Health & Hum Servs.*,
510 F. Supp. 3d 29 (S.D.N.Y. 2020) .......... 41

*Robert Half Int'l, Inc. v. Billingham*,
315 F. Supp. 3d 419 (D.D.C. 2018) .......... 44

*Russian Volunteer Fleet v. United States*,
282 U.S. 481 (1931) .......... 32, 34

*S. Educ. Found. v. U.S. Dep't of Educ.*,
__ F. Supp. 3d __, 2025 WL 1453047 (D.D.C. May 21, 2025), *appeal docketed*, No. 25-5262 (D.C. Cir. July 17, 2025) .......... 29

*Saline Parents v. Garland*,
88 F.4th 298 (D.C. Cir. 2023) .......... 21

*Susman Godfrey LLP v. Exec. Off. of President*,
__ F. Supp. 3d __, 2025 WL 1779830 (D.D.C. June 27, 2025) .......... 34, 35

*Texas Children's Hosp. v. Burwell*,
76 F. Supp. 3d 224 (D.D.C. 2014) .......... 44

*Toxco Inc. v. Chu*,
724 F. Supp. 2d 16 (D.D.C. 2010) .......... 34

*Trifax Corp. v. Dist. of Columbia*,
314 F.3d 641 (D.C. Cir. 2003) .......... 35

*Turner v. U.S. Agency for Global Media*,
502 F. Supp. 3d 333 (D.D.C. 2020) .......... 43

*Widakuswara v. Lake*,
773 F. Supp. 3d 46 (S.D.N.Y. 2025) .......... 45

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008) .......... 43

*Wisc. Gas Co. v. F.E.R.C.*,
758 F.2d 669 (D.C. Cir. 1985) .......... 2, 41

*Xiaomi Corp. v. Dep't of Def.*,
2021 WL 950144 (D.D.C. Mar. 12, 2021) .......... 40, 41

**Statutes**

21 U.S.C. § 2313a .......... 10, 11, 28, 39

21 U.S.C. § 2313a(a)(2) ........ 11, 29

21 U.S.C. § 9714(a) ........ 30

31 U.S.C. § 5318A(a)(2)(B) ........ 11

31 U.S.C. § 5318A(a)(2)(C) ........ 11

31 U.S.C. § 5318A(a)(4)(B) ........ 15

31 U.S.C. § 5318A(c)(2)(B)(ii) ........ 11, 27

5 U.S.C. § 553 ........ 11

5 U.S.C. § 701(a)(2) ........ 21

5 U.S.C. § 704 ........ 21

**Rules**

Fed. R. Civ. P. 65(c) ........ 44

## INTRODUCTION

CIBanco S.A., Institución De Banca Multiple ("CIBanco" or "the Bank"), one of Mexico's largest banks, is on the verge of collapse due to a misguided Order[1] (the "Order") unlawfully issued by the U.S. Department of the Treasury in violation of the Bank's due process rights under the Administrative Procedure Act ("APA") and the U.S. Constitution. While CIBanco has repeatedly pleaded with Defendants to correct this unlawful action on their own, the imminent loss of the Bank's final lifeline to the U.S. financial system—now set to take place on August 21, 2025—necessitates the Court's immediate intervention.

CIBanco is likely to succeed on the merits of its claims that the Order is unlawful. In contravention of administrative procedure, the agency based its action on a record so thin and convoluted that nearly every commercial bank could be designated as a "primary money laundering concern in connection with illicit opioid trafficking." Defendants seem intent to impose a financial "death penalty" without regard to the impact on the legitimate and robust business activities that will be collaterally harmed, or to whether lesser measures address the government's stated concerns. Defendants' approach here is prohibited by basic principles of administrative law and the authorizing statute itself. Agency actions must be struck down where they fail to consider "significant and viable and obvious alternatives." *Dist. Hosp. Partners, LP v. Burwell*, 786 F.3d 46, 59 (D.C. Cir. 2015) (citation omitted).

The merits of CIBanco's constitutional claims are even clearer. Defendants issued the Order unnecessarily without notice or any opportunity to be heard, in violation of the minimum due process requirements of the Fifth Amendment. Since the Order's issuance, Defendants have

[1] Imposition of Special Measure Prohibiting Certain Transmittals of Funds Involving CIBanco S.A., Institución De Banca Multiple, 90 Fed. Reg. 27770 (June 30, 2025).

refused to provide CIBanco the evidence on which they relied—evidence they should have provided *before* the Order was issued—and therefore have afforded no meaningful opportunity to rebut the evidence. This is a textbook due process violation that has deprived CIBanco of its liberty and property interests here in the United States and elsewhere.

The irreparable harm here is clear and obvious: an agency of the U.S. government has unilaterally chosen to bring a more than 3,000-employee bank to the brink of destruction. The Bank will not be able to process the hundreds of millions of U.S. dollar transactions that it performs daily as part of its currency exchange business. In the wake of the Order, Visa has terminated service for approximately 220,000 debit and prepaid cards used by CIBanco customers. Over $40 billion in assets held by the Bank as trustee for U.S. beneficiaries are at risk of being stranded. And the Mexican government is poised to start seizing parts of the Bank's business out of fear of its imminent collapse. Most of CIBanco's U.S. correspondent banks have already terminated their relationships, and its last U.S. correspondent bank has said it will end its relationship with CIBanco on August 21, 2025 due to the Order, effectively barring CIBanco from the U.S. financial system. Ruinous economic injuries of this nature are irreparable and must be enjoined on an emergency basis where "the loss threatens the very existence of the movant's business." *Wisc. Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). The Court must intervene immediately to save this bank.

## BACKGROUND

### I. CIBanco's Business

CIBanco got its start more than forty years ago, when a group of entrepreneurs established a currency exchange house called Consultoría Internacional. Declaration of Fernando Uriel Lopez De Jesus in Support of Plaintiff's Motion for a Temporary Restraining Order ("De Jesus Decl.") ¶ 5. Consultoría Internacional grew and, in 2008, the Mexican government authorized its

transformation into CIBanco. De Jesus Decl. ¶ 5. Today, CIBanco's more than 3,000 employees provide a variety of banking services from 222 branches across Mexico to tens of thousands of customers across the world. De Jesus Decl. ¶ 7. Prior to the Order, CIBanco was the 20th largest bank in Mexico, with $7 billion in assets as of May 2025 and more than $144 billion in transaction volume between 2015 and May 2025. De Jesus Decl. ¶ 6. Prior to the Order, it also had issued approximately 220,000 debit and prepaid cash cards to its customers in partnership with Visa, providing customers access to the digital economy. De Jesus Decl. ¶ 13. CIBanco also plays a key role in the currency exchange market, providing both commercial and individual customers the critical ability to quickly and easily exchange fiat currencies, such as U.S. dollars for Mexican pesos (or vice versa). De Jesus Decl. ¶ 8. In addition to its spot currency exchanges, CIBanco offers financial derivative products that allow customers to hedge against currency risks (i.e., protecting against a rise or fall of the Mexican peso). De Jesus Decl. ¶ 8.

CIBanco operates a conservative banking model. Approximately 98% of CIBanco's transactions are settled with funds located at separate third-party banks, a process which triggers multiple know-your-customer ("KYC") reviews by multiple financial institutions. De Jesus Decl. ¶ 11. For instance, if a CIBanco customer wishes to swap U.S. dollars for Mexican pesos at CIBanco using their U.S. bank account, CIBanco first initiates a KYC process to onboard the client as a CIBanco currency exchange client. De Jesus Decl. ¶ 11. If the client passes the KYC review, CIBanco will then initiate the currency exchange process and send the transaction to the U.S. bank, which will initiate its own KYC procedure. De Jesus Decl. ¶ 11. If CIBanco is handling an incoming wire transfer, there are even more KYC reviews by other financial institutions. Prior to receiving the wire, the ordering bank, U.S. correspondent bank (if the wire is coming from the United States), and any involved intermediary bank conduct their own KYC around the

transaction; CIBanco likewise conducts its own independent KYC. De Jesus Decl. ¶ 11. For approximately 90% of incoming wire transfers, CIBanco transfers the funds to a different third-party bank, which also has its own KYC procedures. De Jesus Decl. ¶ 11. Given its business model—and its principal role as an intermediary in the U.S. and Mexican financial systems—CIBanco is very rarely the only financial institution reviewing the propriety and risk of a transaction.

CIBanco takes its role in evaluating transactions very seriously. Over the last seven years, CIBanco has spent more than $70 million improving its anti-money laundering ("AML") programs and controls—the equivalent of the Bank's combined profits over the past three years. De Jesus Decl. ¶ 21. CIBanco also undergoes frequent substantive reviews of its AML/countering the financing of terrorism ("CFT") program by internal auditors, Mexican regulators, and external auditors, including Ernst & Young, to ensure the integrity and effectiveness of the program and to prevent the financial system from being used by illicit actors. De Jesus Decl. ¶ 22. Since 2018, CIBanco has worked with K2 Integrity, a U.S.-based firm, to conduct qualitative and quantitative risk assessments of CIBanco from a U.S. regulatory perspective. De Jesus Decl. ¶ 23. And to ensure the integrity of its workforce, CIBanco maintains a rigorous insider threats program, has a robust ethics policy, and provides extensive training initiatives. De Jesus Decl. ¶ 25. CIBanco also engaged Barry M. Koch PLLC, an internationally recognized compliance leader, to assess the strengths of its customer risk ratings and screening processes, as well as to assess CIBanco's monitoring/alerting scenarios, its governance of unusual operations, and its compliance committee. De Jesus Decl. ¶ 24. CIBanco constantly continues to adapt and improve its compliance program; in February 2025, for example, in order to support the U.S. efforts for total elimination of the cartels, CIBanco engaged K2 to develop a strategic plan to address President Trump's

designation of Mexican drug cartels as foreign terrorist organizations. De Jesus Decl. ¶ 26. This program, which was approved by the Board, is further enhancing the Bank's corporate governance, KYC procedures, risk assessment, technological tools, and training. De Jesus Decl. ¶ 26.

In addition to serving as an intermediary between the U.S. and Mexican financial systems, CIBanco operates the largest trust division of any Mexican bank. De Jesus Decl. ¶ 9. CIBanco serves as trustee—the legal titleholder and fiduciary—for thousands of trusts with foreign (non-Mexican) beneficiaries, including over 700 trusts on behalf of U.S. beneficiaries. De Jesus Decl. ¶ 9. Through these trusts, CIBanco serves as the trustee of more than $60 billion dollars in international assets, *with over $40 billion in assets for U.S. beneficiaries.* De Jesus Decl. ¶ 14. U.S. beneficiaries include U.S. city and state pension funds, America's largest U.S. asset managers, and U.S. individuals. De Jesus Decl. ¶ 14. The assets held in these trusts vary significantly and include money, real estate, and collectibles. De Jesus Decl. ¶ 15. CIBanco commonly operates trusts for U.S. investment companies so that they can invest in various Mexican projects. De Jesus Decl. ¶ 15. CIBanco also operates trusts for hundreds of Americans and U.S. companies who own property in certain areas within Mexico that foreigners are otherwise prohibited from acquiring.[2] De Jesus Decl. ¶ 15. Before the Order, CIBanco's trust division was recently valued at approximately $400 million. De Jesus Decl. ¶ 20.

CIBanco only holds a fraction of the trust assets at the Bank itself. The majority of trust assets are held by CIBanco in bank accounts at other financial institutions in Mexico, the United States, and Europe. De Jesus Decl. ¶ 16. As part of its trust business, as of May 2025, CIBanco

[2] Article 27 of the Mexican constitution prohibits foreigners from directly acquiring ownership of land or water within a "restricted zone," which comprises 50 kilometers inland from Mexico's beaches and 100 kilometers along the border. Constitución Política de los Estados Unidos Mexicanos art. 27.

operated approximately 60 trust-related bank accounts inside the United States, approximately 6,300 trust-related bank accounts at other Mexican banks, and approximately 2,000 trust-related bank accounts at CIBanco. De Jesus Decl. ¶ 16. (Since CIBanco, as trustee of the relevant trusts, must control the trust's bank accounts, such accounts are commonly named "CIBanco, SA., IBM as trustee of" followed by an identification number assigned to trust beneficiary. De Jesus Decl. ¶ 17.)

Before the Order, CIBanco's operations teams processed, on average, thousands of transactions a month for these trust accounts, for purposes as varied as paying creditors, arranging charitable donations, making tax payments, and distributing capital according to investment agreements. De Jesus Decl. ¶ 18. CIBanco's trust business is integrated within the larger Bank ecosystem and depends on the commercial banking services to process domestic and international transfers and foreign currency transactions, manage liquidity, and execute investment operations for trust funds. De Jesus Decl. ¶ 18. Because of the Order, these necessary transactions are already being impeded. Beneficiaries will not be able to access their money, receive payments, or meet contractual obligations related to the trusts, therefore risking default, substantial penalties, and losses.

### *A. CIBanco's U.S. Fund Transmittals and Correspondent Banks*

As part of its normal business operations, CIBanco transmits hundreds of millions of U.S. dollars to and from the U.S. financial system on a daily basis. From January 2025 through May 2025, CIBanco completed an average of approximately 1,300 transactions per day with U.S. financial institutions, totaling an average volume of approximately $800 million in daily transactions. De Jesus Decl. ¶ 27. This total volume included an average of approximately 900 outgoing wires from CIBanco to U.S. financial institutions, and an average of approximately 400

incoming wires from U.S. financial institutions to CIBanco. De Jesus Decl. ¶ 27. Wires were most commonly transmitted for clients' commercial payments and currency exchanges (e.g., trading Mexican pesos for U.S. dollars and vice versa). De Jesus Decl. ¶ 27.

CIBanco is a commercial bank with no U.S. branches. To operate its foreign currency exchange or transact in almost any foreign currency—including U.S. dollars—CIBanco relies on U.S. correspondent banks. De Jesus Decl. ¶ 28. A correspondent bank is a financial institution that provides services—such as conducting business transactions and accepting deposits—on behalf of another financial institution. It is vital for non-U.S. financial institutions like CIBanco to maintain a relationship with U.S. correspondent banks to facilitate international financial transactions such as international wire transfers, trade finance, and foreign currency exchange, particularly those involving the U.S. dollar. *See* De Jesus Decl. ¶ 28. The U.S. correspondent bank acts as an intermediary, providing the foreign bank with access to the U.S. financial system. Additionally, the U.S. correspondent bank ensures that all transactions comply with U.S. regulations, such as AML and CFT laws. De Jesus Decl. ¶ 10.

Up until the Order, CIBanco maintained correspondent banking relationships with five U.S. financial institutions.[3] De Jesus Decl. ¶ 29. Since the Order's issuance on June 30, 2025, all but one have withdrawn as correspondent banks to CIBanco, and the last correspondent bank has recently informed CIBanco that it will terminate its correspondent banking relationship in full on August 21, 2025, based on the Order's impending effective date. De Jesus Decl. ¶¶ 30–31. Losing its relationships with U.S. correspondent banks has already significantly damaged CIBanco, as the Bank is even now unable to complete many of the currency exchanges and cross-border

[3] The Order incorrectly states that CIBanco only had two correspondent banks. 90 Fed. Reg. 27770, 27772.

transactions that comprise a significant portion of its business. De Jesus Decl. ¶ 32. Prior to the Order, the U.S. portion of the trust business and foreign currency exchange with the U.S. constituted well over 50% of CIBanco's annual income. De Jesus Decl. ¶ 32. Losing its relationship with its last U.S. correspondent bank will effectively end all of CIBanco's access to the U.S. financial system. De Jesus Decl. ¶ 33.

### *B. U.S. Presence and Property*

To operate within the U.S. financial system and serve its U.S. customers, CIBanco maintains dozens of bank accounts within the U.S. financial system at various U.S.-based banks. De Jesus Decl. ¶ 35. These bank accounts have been used to (a) effectuate U.S. dollar transactions through CIBanco's U.S. correspondent banks; (b) receive customer payments and fees from U.S. customers; and (c) hold assets on behalf of various trusts, often with U.S. beneficiaries. De Jesus Decl. ¶ 35.

At the time of the Order, for example:

- CIBanco maintained two bank accounts at Bank 1 in New York for correspondent banking purposes. De Jesus Decl. ¶ 36.a. On June 25, 2025, the accounts' balance totaled approximately $5.5 million. De Jesus Decl. ¶ 36.a. On July 3, 2025, Bank 1 advised CIBanco that it would terminate its contractual relationship with CIBanco and close its accounts due to the Order. De Jesus Decl. ¶ 36.a. CIBanco's accounts at Bank 1 were subsequently closed. De Jesus Decl. ¶ 36.a.

- CIBanco maintained an account with Bank 2 in Irvine, California for correspondent banking purposes. De Jesus Decl. ¶ 36.b. On June 25, 2025, the account's balance was approximately $224,000. De Jesus Decl. ¶ 36.b. On June 25, 2025, Bank 2 advised CIBanco that it would terminate its contractual relationship with CIBanco and close its account due to the Order. De Jesus Decl. ¶ 36.b. CIBanco's account at Bank 2 was subsequently closed. De Jesus Decl. ¶ 36.b.

- CIBanco maintained two bank accounts at Bank 3 located in Miami, Florida. De Jesus Decl. ¶ 36.c. These accounts were used, among other things, for correspondent banking services, and to receive payments and fees from customers in connection with trust administration services. De Jesus Decl. ¶ 36.c. As of June 25, 2025, the accounts' balances totaled over $500. De Jesus Decl. ¶ 36.c. On June 26, 2025, Bank 3 notified CIBanco that it would terminate its contractual

relationship with CIBanco and close the accounts due to the Order. De Jesus Decl. ¶ 36.c. CIBanco's accounts at Bank 3 were subsequently closed. De Jesus Decl. ¶ 36.c.

- CIBanco maintained a correspondent banking relationship with Bank 4 in Texas for correspondent banking purposes and to make certain bond payments. De Jesus Decl. ¶ 36.d. On June 25, 2025, the account's balance was approximately $8,820. De Jesus Decl. ¶ 36.d. On June 25, 2025, Bank 4 advised CIBanco that it would terminate its contractual relationship with CIBanco and close its account due to the Order. De Jesus Decl. ¶ 36.d. CIBanco's account at Bank 4 was subsequently closed. De Jesus Decl. ¶ 36.d.

CIBanco continues to maintain one bank account at Bank 5 in New York for correspondent banking purposes. De Jesus Decl. ¶ 37. As of August 12, 2025, the approximate balance in the account at Bank 5 was more than $99 million. De Jesus Decl. ¶ 37. While the account remains active, Bank 5 has notified CIBanco that it intends to terminate its relationship with CIBanco and close the account on August 21, 2025 to comply with the Order. De Jesus Decl. ¶ 37.

CIBanco also maintains dozens of bank accounts inside the United States at U.S. financial institutions as part of its trustee responsibilities, including accounts at ten U.S. banks. In total, these trust accounts presently hold over $38 million at banks inside the United States. De Jesus Decl. ¶ 39. Since the Order's publication, CIBanco has been unable to access many of these accounts, as U.S. financial institutions begin to comply with the Order prohibiting transmittal of funds to and from CIBanco. De Jesus Decl. ¶ 40. Based on the way the trusts are structured, beneficiaries also cannot directly access these trusts, meaning the assets are effectively stranded in U.S. banks. De Jesus Decl. ¶ 40.

Separate from its bank relationships, CIBanco had a partnership with Visa through which Visa agreed to provide key processing services for approximately 220,000 debit and prepaid cash cards issued by CIBanco. De Jesus Decl. ¶ 41. As part of this agreement, CIBanco maintained an account in the United States with Visa, through which it made payments to and received payments

from Visa; as of June 25, 2025, the balance of this account was approximately $2.7 million. De Jesus Decl. ¶ 41.

On June 30, 2025, Visa terminated its relationship with CIBanco based on the Order. De Jesus Decl. ¶ 42. Visa's termination caused approximately 150,000 CIBanco-issued Visa prepaid cash cards to stop working and approximately 70,000 additional debit cards to be blocked from working abroad. De Jesus Decl. ¶ 42.

In its financial derivative products business, CIBanco's risk policy requires, upon the execution of a financial derivative transaction with a customer, mitigation of that risk. De Jesus Decl. ¶ 43. Prior to the Order, CIBanco hedged the risk by entering into separate derivative contracts with U.S. banks. As part of those agreements, CIBanco posted tens of millions of dollars of collateral with these counterparties inside the United States. De Jesus Decl. ¶ 43.

In response to the Order, CIBanco's U.S. counterparties unilaterally terminated these contracts prior to their date of maturity and kept CIBanco's funds as collateral, causing significant losses to CIBanco. De Jesus Decl. ¶ 44.

## II. The FEND Off Fentanyl Act and Section 2313a Authority

In April 2024, Congress passed the FEND Off Fentanyl Act,[4] which, among other things, added 21 U.S.C. § 2313a to the U.S. Code. Section 2313a provides that if the Secretary of the Treasury "determines that reasonable grounds exist for concluding" that a financial institution operating outside of the United States "is of primary money laundering concern in connection with illicit opioid trafficking," the Secretary may, "by order, regulation, or otherwise as permitted by law," require domestic financial institutions and domestic financial agencies to take one or more of six "special measures" against the non-U.S. financial institution that the Secretary has found to

[4] The FEND Off Fentanyl Act is Division E of Public Law 118-50 (Apr. 24, 2024).

be "of primary money laundering concern in connection with illicit opioid trafficking." The statute is modeled after and incorporates parts of Section 311 of the USA PATRIOT Act, which granted the Secretary of Treasury a similar authority for non-U.S. banks of "primary money laundering concern" (without the opioid qualifier).

Neither Section 2313a nor Section 311 of the USA PATRIOT Act defines what constitutes a "primary money laundering concern." But the latter statute does require, and FinCEN adopted in this Order, *see* 90 Fed. Reg. 27770, 27771, certain considerations before the imposition of any special measures, including "the extent to which such institutions . . . are used for legitimate business purposes in the jurisdiction." 31 U.S.C. § 5318A(c)(2)(B)(ii).

Of the six "special measures" Section 2313a authorizes, the first five are incorporated by reference and come from Section 311. The sixth special measure, which authorizes the Treasury Department to prohibit U.S. financial institutions from transmitting funds to or from a targeted bank, is unique to Section 2313a.[5] Section 2313a provides that the new sixth special measure may be imposed "by order, regulation, or otherwise as permitted by law." 21 U.S.C. § 2313(a).[6]

## III. FinCEN's Unexpected Order Against CIBanco

On June 25, 2025, with no prior notice to the Bank, FinCEN publicly announced that it had issued orders imposing the sixth "special measure" and prohibiting U.S. financial institutions from

---

[5] The sixth special measure provides that the Secretary of the Treasury "may, by order, regulation, or otherwise as permitted by law . . . . prohibit, or impose conditions upon, certain transmittals of funds (to be defined by the Secretary) by any domestic financial institution or domestic financial agency, if such transmittal of funds involves any such institution, class of transaction, or type of accounts." 21 U.S.C. § 2313a(a)(2)

[6] Similar to the sixth special measure, Section 311 allows the first four special measures to "be imposed by regulation, order, or otherwise as permitted by law." 31 U.S.C. § 5318A(a)(2)(B). The fifth measure, restricting correspondent banking accounts, is only permitted through regulation, § 5318A(a)(2)(C), thereby triggering the notice-and-comment rulemaking requirements of the APA. 5 U.S.C. § 553.

engaging in the transmittal of funds involving CIBanco and two other Mexico-based banks. Press Release, Financial Crimes Enforcement Network, "Treasury Issues Unprecedented Orders Under Powerful New Authority to Counter Fentanyl" (June 25, 2025), https://www.fincen.gov/news/news-releases/treasury-issues-unprecedented-orders-under-powerful-new-authority-counter. The press release issued by FinCEN acknowledged the orders were "unprecedented." *Id.* The Order, which was formally published in the Federal Register on June 30, 2025, announced action based on its finding (made without even talking to the Bank) that "reasonable grounds exist to conclude" that CIBanco is of "primary money laundering concern in connection with illicit opioid trafficking." 90 Fed. Reg. 27770, 27771.

The Order alleges that CIBanco engaged in the "provision of financial services that facilitate illicit opioid trafficking by Mexico-based drug trafficking organizations (DTOs), including (1) the Gulf Cartel, (2) the Beltran-Leyva Organization (BLO) Cartel, and (3) Jalisco New Generation Cartel (CJNG)." 90 Fed. Reg. 27770. Most of the Order's factual discussion surrounds these cartels themselves and trafficking activities that are entirely unconnected to CIBanco. Indeed, there are only two vague allegations that relate to both these DTOs and CIBanco:

- The Order alleges that "in the beginning half of 2023, a CIBanco employee knowingly facilitated the creation of an account to purportedly launder USD 10 million on behalf of a Gulf Cartel member." 90 Fed. Reg. 27770, 27772. The Order does not allege money moved through CIBanco—only that an account was created. It also does not provide the employee's name, location, or other details that could identify who may have been involved.

- The Order alleges that "between August and September 2024, Mexico-based money brokers working on behalf of BLO Cartel and CJNG coordinated the movement of up to the equivalent of USD 26,000 in illicit funds to CIBanco." 90 Fed. Reg. 27770, 27773. But the Order does not provide any additional details about these individuals' names, their locations, the accounts involved, or what knowledge, if any, CIBanco had.

The remainder of the Order's evidence focuses on CIBanco's alleged role in the purchase of the precursor chemicals used to produce illicit opioids, which the Order notes are "sourced largely from the People's Republic of China (China)." 90 Fed. Reg. 27770, 27771. The actual examples, however, are a confusing ball of anonymized transactions—some to China but others to Switzerland, Japan, South Korea, and elsewhere in the world—with no details (names, account numbers, etc.) that would allow someone to vet these allegations. The common theme seems to be that each involves a company that was implicated in drug (but not necessarily opioid) trafficking in one instance that had nothing to do with CIBanco, and then that company either sent or received money separately using CIBanco. Less than half of these companies seem to be CIBanco customers, and there is no indication at all about what knowledge or red flags CIBanco failed to act on (if any). The examples are the following:

- Over a six-year period, law enforcement seized "at least four shipments associated with a Mexico-based company that contained precursor chemicals or illicit drugs including methamphetamine." 90 Fed. Reg. 27770, 27773. There is no connection of those seizures to CIBanco. Separately, however, this company used CIBanco to "sen[d] over 40 wires [over eight years] totaling over USD 200,000 to shipping companies based in countries including Japan and South Korea." 90 Fed. Reg. 27770, 27773. The Order does not explain the connection, if any, between the 40 wires to Japan and South Korea and opioid precursors from China.

- On one occasion, "a CJNG precursor chemical broker facilitated an order of dimethyl carbonate from a China-based chemical supplier to a second Mexico-based company." 90 Fed. Reg. 27770, 27773. There is no connection of that event to CIBanco.[7] Separately, however, this company was "associated with more than 150 funds transfers totaling over USD 100 million involving industrial companies based in countries including Taiwan and Switzerland through CIBanco." 90 Fed. Reg. 27770, 27773. The Order does not explain how these transfers to Switzerland and Taiwan are connected, if at all, to opioid precursors from China.[8]

[7] There is no explained connection between dimethyl carbonate and opioid production. Dimethyl carbonate is not a regulated precursor, and it is an extremely common chemical used in the production of, among other things, lithium batteries, coatings, adhesives, and fuel additives.

[8] The Order's use of the word "China" is solely to the People's Republic of China and is not defined to include Taiwan (formally the "Republic of China"). *See* 90 Fed. Reg. 27770, 27771.

- Brokers "likely" once facilitated a shipment of hydroxylamine hydrochloride through a third Mexico-based company. 90 Fed. Reg. 27770, 27773. There is no allegation that CIBanco was involved. Separately, however, this company "sent over 150 funds transfers totaling over USD 130,000 to industrial companies in the U.S. and Mexico through CIBanco." 90 Fed. Reg. 27770, 27773–74. The Order does not explain how these transfers were connected, if at all, to opioid precursors from China.

- The Order alleges that three unnamed companies located in China were "known to have shipped precursor chemicals to Mexico for illicit purposes." 90 Fed. Reg. 27770, 27774. There is no allegation that any of this information was known, or should have been known, to CIBanco. Separately, however, these three companies received funds totaling $2.135 million via 30 transfers through unnamed CIBanco accounts. 90 Fed. Reg. 27770, 27774. The Order does not explain how these transfers were connected, it at all, to opioid precursors.

After this recitation of eight examples over a decades-long period, the Order then considered other factors to determine whether CIBanco is a "primary money laundering concern in connection with illicit opioid activity" and, if so, which of the enumerated special measures to impose.

The Order states that it considered the extent to which CIBanco is used for legitimate business purposes, 90 Fed. Reg. 27770, 27774, but in its supposed consideration of this factor, singularly focuses on CIBanco's total assets ($7 billion) and concludes, in effect, that because the Bank is "only" the 20th largest financial institution in Mexico, there is insufficient legitimate activity to warrant any further consideration.[9] 90 Fed. Reg. 27770, 27774. The Order does not address CIBanco's actual activity—the number of unquestioned, legitimate transactions it completes each day; its number of customers; and the other services it provides customers. Most importantly, the Order makes no mention of the over $60 billion of trust assets that CIBanco oversees, how that business operation is overwhelmingly larger than any of the alleged illicit

[9] The $7.04 billion in assets cited by the government does not include any of the more than $60 billion in assets that CIBanco is responsible for as part of its trustee duties.

conduct, and how over $40 billion of assets held in trust for U.S. companies and persons would be put at risk by FinCEN's action. De Jesus Decl. ¶ 14. FinCEN also engaged in no review of CIBanco's controls, its AML compliance program, or other mitigating factors to demonstrate the lack of intent to facilitate any transactions that further illicit opioid trafficking. The Order instead merely claims that no such review of AML policies was necessary based on "the evidence described in this Order and the totality of the circumstances." 90 Fed. Reg. 27770, 27774.

Turning to the question of which special measure would be appropriate for CIBanco, the Order only recites the relevant factors identified in 31 U.S.C. § 5318A(a)(4)(B) and states, without analysis, that they were considered. 90 Fed. Reg. 27770, 27775. When discussing the extent to which the action "could have a significant adverse systemic impact on legitimate business activities involving CIBanco," the Order makes no acknowledgement of the crippling effect it will have on the Bank's core services, just that similar banking services would be "readily available through other regulated institutions." 90 Fed. Reg. 27770, 27775.

Likewise, when considering whether any of the first four special measures would be more appropriate here, the Order states the conclusion, without analysis, that the first four special measures would be insufficient because they "would allow such transfers to continue to the benefit of illicit actors connected to illicit opioid trafficking." 90 Fed. Reg. 27770, 27776. The Order does not acknowledge or address the less restrictive imposition of conditions short of prohibition set forth in the sixth special measure, let alone why they, too, are insufficient.

Finally, in explaining why it elected to proceed by order, instead of by notice and comment rulemaking, FinCEN states that an order was the "most appropriate course of action given the imminent threats posted by the illicit actors . . . as well as the ongoing transactions associated with suspected activity." 90 Fed. Reg. 27770, 27776. But the Order never alleges or describes ongoing

transactions of concern, and none of the allegations in the Order involve conduct in 2025 that would support the heightened need to forego due process protections afforded through rulemaking. The Order ends by stating the agency's preordained outcome: a directive to all domestic financial institutions prohibiting them from engaging in any transmittal of funds from or to CIBanco. 90 Fed. Reg. 27770, 27776.

## IV. FinCEN Refused to Explain Its Order or Provide the Information on Which It Relied

As soon as it learned of the Order, CIBanco began to contact the Treasury Department, FinCEN, and other government officials to understand the allegations and evidence on which FinCEN relied, and to seek an appropriate opportunity to be heard. On July 2, 2025, CIBanco made multiple submissions to FinCEN. De Jesus Decl. ¶ 46. It explained the Bank's unwavering support for the Administration's fight against the cartels and its own commitment to policing the Bank against misuse by cartels and illicit opioid trafficking actors, including through its AML and financial crimes compliance programs. De Jesus Decl. ¶ 46. Also on July 2, 2025, CIBanco separately submitted information about CIBanco's trust services business. CIBanco warned that the Order places the future of CIBanco's trust services business in jeopardy and created systemic risks given CIBanco's prominent role in the administration of Mexican trusts, including trusts that serve U.S. interests. De Jesus Decl. ¶ 46. It also explained how the trust services operation would cease to function if the Order went into effect. De Jesus Decl. ¶ 46.

As soon as the Order was published, CIBanco also began to try desperately and unsuccessfully to use the sparse and vague information in the Order to see if it could identify what customers and transactions FinCEN might have focused on. But for a commercial bank of CIBanco's size, this is not just looking for needles in haystacks—it is looking for needles in

hayfields.[10] Because the Order does not provide adequate detail, CIBanco has repeatedly requested that the Defendants provide information that would allow CIBanco, in conjunction with its auditors and forensic accounting teams, to properly investigate the allegations and findings that underpin the Order.

On June 30, 2025, CIBanco met with Treasury Department officials and requested additional information about the allegations in the Order so it could investigate. De Jesus Decl. ¶ 50. On July 2, 2025, after repeating the request during a videoconference with Director Gacki and FinCEN representatives, CIBanco's counsel followed up with a letter to FinCEN requesting further details about the alleged accounts and transactions.[11] De Jesus Decl. ¶ 51. On July 8, 2025, CIBanco's counsel submitted another letter, repeating the informational request to FinCEN so that the Bank could properly investigate the allegations in the Order, and respond in full. De Jesus Decl. ¶ 53. Since then, CIBanco's representatives have repeated their informational request in subsequent meetings with officials from FinCEN and the Treasury Department. De Jesus Decl. ¶ 55. FinCEN and Treasury officials have yet to provide any such information. De Jesus Decl. ¶ 57.

In repeated correspondence and meetings, CIBanco has sought to avoid litigation in hopes of demonstrating to the government that it is a trustworthy and committed partner in the fight

---

[10] For reference, between December 2021 and October 2024 (the period in which the 30 transactions totaling $2.135 million alleged occurred), CIBanco processed a total of 57,276 transactions to China on behalf of 2,275 customers totaling over $2.39 billion. De Jesus Decl. ¶ 47.

[11] The letter identified specific facts the Bank sought to assess the allegations, including (a) the name of the CIBanco employee who allegedly opened an account for the Gulf Cartel member, and the account information in question; (b) account details connected to the $26,000 allegedly transmitted through CIBanco by cartel-linked money brokers; (c) the names of the three Mexico-based companies discussed in the Order and details about the suspected transactions; and (d) the names of the three China-based companies and details about the suspected transactions. De Jesus Decl. ¶ 51.

against the cartels. On July 2, 2025, and again on July 8, 2025, CIBanco's counsel has asked FinCEN to lift the Order or, in the alternative, to extend the Order's effective date by an additional 180 days to allow a more thorough analysis of the allegations and a good faith dialogue between the parties. De Jesus Decl. ¶¶ 52, 54. On July 30, 2025, CIBanco's counsel met with FinCEN to again propose a cooperative path forward, proposing a 180-day extension with a public statement by FinCEN that the parties are cooperating and working towards an agreement that would allow the Bank to continue to operate, which might obviate need for litigation or preliminary relief. De Jesus Decl. ¶ 56. During any extension period, CIBanco offered to submit to a review of its compliance programs and any other operations of the Bank that FinCEN wished to examine and to discuss additional, less severe measures, including the use of an independent auditor paid for by the Bank, that would allay FinCEN's concerns about CIBanco. De Jesus Decl. ¶ 56. FinCEN has not responded to the Bank's proposal or engaged on any extension of the Order's effective date beyond September 4, 2025. De Jesus Decl. ¶ 57.

## V. FinCEN's Order Is Crippling the Bank

The Order prohibits any U.S. financial institution "from engaging in any transmittal of funds from or to CIBanco." 90 Fed. Reg. 27770, 27776. The Order defines "transmittals of funds" broadly to include the sending and receiving of funds, including convertible virtual currency. 90 Fed. Reg. 27770, 27776. In short, the Order prohibits any U.S. bank from engaging in any type of financial transaction with CIBanco, either directly or through a financial intermediary. For a bank so fundamentally involved in currency exchanges and the administration of tens of billions of dollars in assets held in trust for U.S. interests, CIBanco stands little chance of surviving the Order in its current form (assuming regulators do not liquidate or sell the Bank first). *See* De Jesus Decl. ¶¶ 33, 65.

As noted above, CIBanco's U.S. correspondent banks have terminated or are in the process of terminating their relationships with CIBanco due to the Order. Without suspension of the Order, CIBanco will lose access to its final correspondent bank account on August 21, 2025. De Jesus Decl. ¶ 31. CIBanco is also being prevented from accessing U.S. bank accounts held by CIBanco as trustee, as U.S. financial institutions prepare to comply with the Order. De Jesus Decl. ¶ 40. Other U.S. financial services began to end their relationships with CIBanco, including Visa and U.S. counterparties to derivative transactions. De Jesus Decl. ¶¶ 42, 44. The reputational damage from the Order has also caused non-U.S. banks to exit their relationships with CIBanco out of fear of being targeted separately by U.S. authorities. De Jesus Decl. ¶ 61.

The Mexican government has publicly stated that, like CIBanco, it has not received any additional information that corroborates FinCEN's allegations that CIBanco is a primary money laundering concern with respect to illicit opioid trafficking.[12] Nevertheless, the sudden and unexpected actions by FinCEN have forced the Mexican government to try to intercede before the Order's effective date of September 4, 2025. Driven by worries about the systemic risk to CIBanco's trust division, on July 4, 2025, the Mexican Finance Ministry issued a statement announcing that it had begun the process to seize CIBanco's trust division and temporarily transfer

[12] Mexican President Claudia Sheinbaum publicly stated that the government had received "no evidence" to support FinCEN's allegations. Noe Torres & Emily Green, "Mexican Regulator Takes Over Running of Banks Hit by US Fentanyl Sanctions," Reuters (June 26, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/mexican-regulator-takes-over-running-banks-hit-by-us-fentanyl-sanctions-2025-06-26/. Similarly, a June 25, 2025 press release by Mexico's bank regulator stated that, "[t]he Department of the Treasury was requested to provide evidence of the link between these institutions and illicit activities that could be corroborated . . . however, no probative information in this regard was received." Press Release, Hacienda, "Nota Informativa Sobre Investigaciones En El Sector Financiero" (June 25, 2025), https://www.gob.mx/shcp/prensa/295579.

it to the Mexican development bank entities.[13] The Finance Ministry said it would then look for a permanent solution to transfer them over to different private institutions.

Removing CIBanco's trust division will deprive the Bank of a significant revenue source and a business unit recently valued, before the Order, at $400 million. De Jesus Decl. ¶ 20. Moreover, even a well-intentioned effort to extract the trust division under these constrained time periods and without any preplanning significantly risks losses to the beneficiaries of those trusts. All trusts will require a comprehensive migration of accounts, contracts, accounting records, policies, cash flows, physical and digital files, licenses, operational platforms (including CIBanco's proprietary software used to manage the trust division), qualified and well-trained personnel, and assets. De Jesus Decl. ¶ 63. Mexican law also requires approvals, notice, and opportunities to object. CIBanco estimates it should take five-to-six months to implement a transfer to government-controlled banks, time that is not available under the current Order. De Jesus Decl. ¶ 63.

The pressure of the Order is severely impairing the Bank's performance. In the month following the Order, foreign exchange revenues have fallen by more than 90%. De Jesus Decl. ¶ 64. CIBanco has also lost more than 40% of total deposits as customers assess the long-term viability of the Bank. De Jesus Decl. ¶ 64. These losses will likely soon be irreversible, and many of the more than 3,000 Bank employees will be terminated when the Bank is forced to cease its international commercial operations and either close or dramatically downsize. De Jesus Decl. ¶ 65.

---

[13] *See* Valentine Hillaire, "Mexico to Spin Off Trusts of Intervened Banks CIBanco, Intercam," Bloomberg (July 4, 2025), https://www.bloomberg.com/news/articles/2025-07-05/mexico-to-spin-off-trusts-of-intervened-banks-cibanco-intercam.

## LEGAL STANDARD AND REVIEWABILITY

A party seeking a temporary restraining order must establish that four factors, taken together, weigh in favor of preliminary relief: likelihood of success on the merits, likelihood of irreparable harm in the absence of preliminary relief, that the balance of the equities tips in its favor, and that preliminary relief is in the public interest. *Costa v. Bazron*, 456 F. Supp. 3d 126, 133 (D.D.C. 2020). These factors match those the Court considers when deciding whether to issue a preliminary injunction. *Id.*; *see also League of Women Voters of United States v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016). And when the government is the opposing party, the balance of the equities and public interest factors are considered as one. *See, e.g.*, *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Pursuing America's Greatness v. F.E.C.*, 831 F.3d 500, 511 (D.C. Cir. 2016). The "primary purpose" of preliminary relief is to "preserve the status quo" such that a subsequent judicial decision on the parties' rights remains meaningful. *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014) (quotation omitted).

The Order is unquestionably reviewable under the APA as final agency action for which there is no other remedy, 5 U.S.C. § 704, and which has not been committed by law to agency discretion, *id.* § 701(a)(2). While the Order is set to officially take effect on September 4, 2025, U.S. financial institutions are already severing ties with CIBanco to comply with the Order, and the Mexican government is presently moving to seize some of the Bank's operations. CIBanco is therefore feeling the Order's "effects" in a very "concrete way." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (citation omitted). The issues raised in this motion are thus "fit[] . . . for judicial decision" now, and "the hardship . . . of withholding court consideration" until some later date would be immense to CIBanco. *Saline Parents v. Garland*, 88 F.4th 298, 306 (D.C. Cir. 2023) (citation omitted).

## ARGUMENT

All factors to be considered for a temporary restraining order weigh heavily in favor of CIBanco. *First*, CIBanco is likely to succeed on the merits of its APA claim, as the perfunctory explanation provided by FinCEN in its Order makes clear that its decision to bar U.S. financial institutions from transmitting funds to and from CIBanco (a) runs counter to the evidence before it, (b) ignores important parts of the issue it was considering, and (c) fails to consider reasonable alternative measures. CIBanco is also likely to succeed on the merits of its Fifth Amendment due process claim, as the Bank received no notice of FinCEN's Order before it was issued and has had no meaningful opportunity to respond to the allegations—before or after the Order's publication.

*Second*, CIBanco faces severe, imminent, and irreparable harm in the absence of emergency relief: most of its business is being shuttered or seized, destroying hundreds of millions of dollars of value, as U.S. financial institutions and other financial institutions that transact with the United States continue to terminate their relationships with CIBanco to prepare to comply with FinCEN's Order. CIBanco will continue to lose customers and business partners from the reputational harm of being branded a bank that facilitates money laundering in connection with opioid trafficking; and it will suffer the deprivation of its constitutional right to due process.

And *finally*, the balance of the equities and the public interest support the issuance of a temporary restraining order to prevent violations of the constitutional and statutory safeguards on Defendants' conduct. In addition to the financial losses and chaos that the Order will expose to CIBanco, its customers, trust beneficiaries, and others with which it does business, it is never in the public interest for the Executive Branch to violate the duly enacted laws of the United States, let alone the U.S. Constitution. CIBanco's requested relief is also consistent with the purpose of a temporary restraining order: CIBanco simply asks for FinCEN's Order to be enjoined so that it is not out of business by the time this Court can resolve this matter on the merits.

## I. CIBanco Is Likely to Prevail on the Merits of Its APA and Constitutional Due Process Claims.

CIBanco is likely to prevail on both its APA and constitutional claims, as the Order was not the product of reasoned agency decision-making and it failed to abide by constitutional due process requirements. This likelihood of success is the "first and most important factor" in establishing CIBanco's right to emergency relief. *Aamer*, 742 F.3d at 1038.

### *A. Plaintiff Is Likely to Succeed on the Merits of Its Claim that the Designation Was Arbitrary, Capricious, and Contrary to Law in Violation of the APA.*

An agency acts arbitrarily, capriciously, and contrary to law, in violation of the APA, when it "relie[s] on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it [can]not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In evaluating agency actions under the "arbitrary and capricious" standard, courts "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (quotations omitted). When review of an agency's action is "bound up with a record-based factual conclusion," the reviewing court must determine whether that conclusion "is supported by substantial evidence." *Dickinson v. Zurko*, 527 U.S. 150, 164 (1999) (quotations omitted).

Here, the Order contains conclusory allegations about CIBanco's connections to opioid trafficking, fails to connect the dots in a way that supports its conclusions about CIBanco's facilitation of opioid and precursor trafficking, and offers such scant details that it is impossible to understand how persuasive (or unpersuasive) the examples are of alleged facilitation.

Separately, in finding that CIBanco is a "primary" money laundering concern, the Order fails to consider CIBanco's legitimate business activities—including several business lines, such as its loan business, its debit and prepaid card program, and its over $60 billion trust business that are not connected to the allegations in the Order. Moreover, the Order does not appropriately evaluate the volume of CIBanco's business (in dollars or numbers of transactions) to understand the extent and proportionality of CIBanco's legitimate business.

Finally, in applying the severest punishment possible—a full ban on all fund transmittals to and from U.S. financial institutions—the Order fails to consider responsible and obvious alternatives and to give a reasoned explanation for its rejection of such alternatives, when they would in fact clearly allay the stated concerns.

**1. Cited Evidence Does Not Support the Conclusion that CIBanco Facilitated Illicit Opioid Trafficking.**

To support its finding that CIBanco is a primary money laundering concern in connection with illicit opioids, the Order alleges that CIBanco "has a history of ties to international DTOs and facilitation of transactions on their behalf." 90 Fed. Reg. 27770, 27772. But the Order does not come close to establishing any such history.

Most of the Order is devoted to basic background about the relevant cartels and the supply chain that allows illicit opioid trafficking: precursor chemicals are imported from China to Mexico-based labs where the cartels produce the opioids and then traffic them to the United States. *See* 90 Fed. Reg. 27770, 27773. ("[M]ost U.S.-destined illicit fentanyl appears to be produced in clandestine labs in Mexico, using precursor chemicals imported from China. . . . China-based suppliers remain the main source for precursor chemicals used by DTOs in Mexico to produce illicit opioids."). None of these background allegations involve CIBanco.

To demonstrate CIBanco's purported ties and facilitation, the Order lists eight examples that supposedly establish CIBanco played some role in the illicit opioid supply chain. The examples, however, are devoid of any details that would establish a basis for the Bank's alleged culpability. They do not even ask, much less answer, the key questions that the government would have needed to evaluate to justify its finding—was the Bank complicit, did it miss red flags, did it engage in risky behavior, and so forth.

Only two of the eight examples attempt to articulate a direct connection between CIBanco and the cartels. The first alleges a "CIBanco employee knowingly facilitated the creation of an account to purportedly launder USD 10 million on behalf of a Gulf Cartel member."[14] 90 Fed. Reg. 27770, 27772. The second alleges that "Mexico-based money brokers working on behalf of BLO Cartel and CJNG coordinated the movement of up to the equivalent of USD 26,000 in illicit funds to CIBanco." 90 Fed. Reg. 27770, 27773. While CIBanco condemns any use of the Bank by unlawful actors, the paucity of details makes it impossible to assess the allegations' veracity and, assuming they are true, whether what the Bank did was wrong—was it actively complicit, did its KYC miss obvious signs, and did it operate in a way that made it more susceptible to such conduct. CIBanco wishes to offer a more definitive response, but the lack of details—and the government's unlawful refusal to provide them—makes it difficult. But as described on this general level, the record does not rationally lend itself to the conclusion that CIBanco was a "primary money laundering concern" based on these two examples.

The remaining examples—six in total—are circuitous in their reasoning. Each seems to follow the same general train-of-thought. FinCEN has information about a company being

[14] The Order does not actually clarify whether money was successfully laundered (or whether bank controls flagged or stopped any transfers with the account). This fact seems critical in terms of the example's probative value.

involved in something illicit ("Event One"). None of the Event Ones involve CIBanco. FinCEN has information that a company involved in an Event One separately either (a) used CIBanco to transfer money to other companies around the world or (b) received money through CIBanco from other companies around the world ("Event Two"). By FinCEN's logic, the fact that a company involved in an Event One has transactional activity through CIBanco in any amount (an Event Two) is sufficient to conclude that such transactional activity (and therefore CIBanco) is associated with opioid trafficking.

The issues with this reasoning are apparent. First, the Order never explains why CIBanco knew or should have known about any of the Event Ones and the parties involved.[15] Second, the few details that are provided as to the transactional activity involving CIBanco (Event Twos) raise numerous questions about how they have anything to do with opioid trafficking. Why are transactions through CIBanco to "industrial companies" in Switzerland and Taiwan suspicious? 90 Fed. Reg. 27770, 27773. Why are transactions to "shipping companies" in Japan and South Korea the same? 90 Fed. Reg. 27770, 27773. CIBanco would like to more forcefully respond to these specific allegations in the Order, but the lack of detail, and the refusal to produce the underlying information, makes that impossible at this time. Defendants, however, should not benefit from their obfuscation and refusal to comply with administrative due process requirements. Instead, the evidence in the Order should just be taken at face value—a few disconnected vignettes, devoid of detail or logical connection. These facts as reported do not support any conclusion that CIBanco has a history of ties to international drug trafficking organizations and facilitation of

[15] The lack of detail about these "Mexico-based companies" and "China-based companies" also obscures whether they should have been inherently suspicious to CIBanco. These companies could be major multinational corporations—the equivalent of Dow Chemicals, DuPont, DHL or UPS—which would severely undermine the idea that these examples highlight CIBanco's clear connections to opioid-trafficking cartels.

transactions on their behalf. This explanation falls well short of the APA's "mandate[] that an agency 'articulate a satisfactory explanation for its action' with a 'rational connection between the facts found and the choice made.'" *Luokong Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 183 (D.D.C. 2021) (quoting *Motor Vehicles Mfrs. Ass'n of the U.S., Inc.*, 463 U.S. at 43).

**2. FinCEN Failed to Consider Critical Relevant Information by Ignoring the Scale of CIBanco's Overwhelmingly Legitimate Activities.**

One of the key considerations in evaluating whether an entity is of "a primary money laundering concern" is the extent to which that entity is used for legitimate business purposes. *See* 31 U.S.C. § 5318A(c)(2)(B)(ii). The Order, however, failed to consider CIBanco's actual activity—the number of clearly legitimate transactions it completes a day, its number of customers, and the other services it provides customers. FinCEN also did not consider the scale of CIBanco's total business, and what fraction of the Bank's total activity was of concern.[16]

FinCEN relatedly ignored large business lines not implicated in purported trafficking. It ignored, for example, that CIBanco operates the largest trust business in Mexico (managing over $60 billion in assets for trustees); provided approximately 220,000 debit and prepaid cards to Bank customers; and provides other services like the sale of derivative products to hedge currency risk. *See* De Jesus Decl. ¶¶ 8–9, 13–14. FinCEN simply turned a blind eye to the fact that the transactions in question, even if genuinely connected to illicit opioid trafficking, would constitute only a sliver of a sliver of CIBanco's overall business. By failing to consider these factors, the

[16] In the only prior use of the "sixth special measure," in contrast, FinCEN did look at the volume of suspicious activity as a fraction of the overall activity; it found that 48% of the total known transaction value involved "illicit finance or other risky sources." Imposition of Special Measure Prohibiting the Transmittal of Funds Involving Bitzlato, 88 Fed. Reg. 3922 (Jan. 23, 2023). This example is discussed in further detail below.

order is therefore arbitrary, capricious, and contrary to law because it "entirely fail[s] to consider an important aspect of the problem." *Motor Vehicles Mfrs. Ass'n of the U.S., Inc.*, 463 U.S. at 43.

Relatedly, FinCEN's Order is also arbitrary, capricious, and contrary to law because it failed to account for the ramifications of cutting off CIBanco's access to the U.S. financial system. *See id.* FinCEN purported to consider "the extent to which the action . . . would have a significant adverse system impact . . . on legitimate business activities involving the particular" bank, 90 Fed. Reg. 27770, 27775; but, because it ignored significant and legitimate business lines, it also failed to consider the detrimental impact of its Order on the hundreds of thousands of CIBanco customers who rely on the Bank, including hundreds of U.S.-based institutions and individuals. Most notably, the Order has no discussion of the Order's impact on CIBanco's administration of over $60 billion of assets in trusts, including the administration of over $40 billion in trusts for U.S. interests. *See* De Jesus Decl. ¶ 14. In fact, these assets are in significant jeopardy of being stranded because of the Order. De Jesus Decl. ¶ 40. The failure to consider CIBanco's trust business demonstrates the degree to which the Order overlooks CIBanco's legitimate business and its own disastrous implications.

**3. FinCEN Failed to Consider Any of the Significant, Viable, or Obvious Alternative Options that Would Address the Problem It Identified.**

Finally, FinCEN's Order is invalid because "it fail[ed] to consider 'significant and viable and obvious alternatives.'" *Dist. Hosp. Partners, LP v. Burwell*, 786 F.3d 46, 59 (D.C. Cir. 2015) (quoting *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013)). There are obvious alternatives to FinCEN's decision to prohibit the transmittal of funds between CIBanco and U.S. financial institutions right in 21 U.S.C. § 2313a, namely the other special measures set forth in the statute. FinCEN dismisses these obvious alternatives as insufficient to "prevent CIBanco from accessing the U.S. financial system," but it has not established any record for why

it is a reasonable and proportionate exercise of its power to shut down all access to U.S. institutions to address the ultimate risk: "allow[ing] such transfers to continue to the benefit of illicit actors connected to illicit opioid trafficking." *See* 90 Fed. Reg. 27770, 27776.

The Order's analysis on the question of reasonable alternatives or special measures is the very definition of boilerplate—indeed, the language in the section on alternatives appears to have been copied in whole (with just the names changed) from the other two orders issued on the same day. *Compare* 90 Fed. Reg. 27770, 27776 *with* Imposition of Special Measure Prohibiting Certain Transmittals of Funds Involving Intercam Banco S.A., Institución de Banca Multiple, 90 Fed. Reg. 27777, 27782–83, *and* Imposition of Special Measure Prohibiting Certain Transmittals of Funds Involving Vector Casa de Bolsa, S.A. de C.V., 90 Fed. Reg. 277764, 27769. This copy-and-paste strategy belies any claim that FinCEN evaluated available alternative measures suitable specifically for CIBanco. *S. Educ. Found. v. U.S. Dep't of Educ.*, __ F. Supp. 3d __, 2025 WL 1453047, at *16 (D.D.C. May 21, 2025) (finding agency action likely violated APA where "the Department's use of a boilerplate letter that was issued to several other grant recipients further strengthens [plaintiff's] argument that there was no rational connection between the facts the Department found, if any, and the termination decision that it made"), *appeal docketed*, No. 25-5262 (D.C. Cir. July 17, 2025). A more individualized analysis is necessary to avoid being contrary to law. *Id.*

While the Order pays lip service to the first through fifth special measures, it ignores entirely a significant, viable, and obvious alternative within the *sixth* special measure; it could have "imposed conditions upon" the transmittal of funds rather than barring CIBanco outright.[17] The

[17] Section 2313a(a)(2) allows that the Secretary of the Treasury may "prohibit, or impose conditions upon, certain transmittal of funds (to be defined by the Secretary)."

plain language of 21 U.S.C. § 2313a(a)(2) provides two obvious and lesser alternatives within the sixth special measure: (1) imposing conditions on, but not prohibiting, the transmittal of funds; or (2) blocking the transmittal of some, *but not all*, funds to CIBanco.[18] For example, FinCEN could elect to allow the transmission of funds to CIBanco, but only if CIBanco operates under the supervision of an agreed-upon monitor or independent auditor; FinCEN could also have allowed funds connected to the administration of trusts to continue, but limited other transmittals it deemed higher risk. FinCEN considered none of these alternatives.

The Order suffers from the same shortcoming that this district court found existed in another FinCEN action, *FBME Bank Ltd. v. Lew* (*FBME I*), 125 F. Supp. 3d 109 (D.D.C. 2015). In that case, the court enjoined the imposition of the full fifth special measure (i.e., a bar on U.S. correspondent banks) due to a failure to consider lesser alternatives within that special measure. The *FBME I* court noted that "given how rarely the fifth special measure is imposed . . . it was incumbent upon the agency, in the Court's view, to consider alternative forms the fifth special measure might take." *Id.* at 125. The Court asked, for example, why conditions could not be placed upon correspondent banking relationships, as opposed to outright bans. *Id*. Here, FinCEN has failed to consider alternative forms the sixth measure might take, making its consideration similarly inadequate under the APA.

History illustrates the irrationality of FinCEN's Order, as there is only one prior instance in which FinCEN has issued an order prohibiting all U.S. financial institutions from transmitting *any* funds to or from a foreign financial institution. In 2023, FinCEN imposed this sanction upon

[18] The Order prohibits all domestic financial institutions "from engaging in any transmittal of funds from or to CIBanco." 90 Fed. Reg. 27770, 27776. Section 2313a(a)(2), however, only authorizes the Secretary to restrict "transmittal of funds . . . by" those domestic institutions (i.e., only barring outgoing wires). The Order's restriction on receiving incoming wires into the United States from CIBanco, therefore, oversteps congressional authorization.

the virtual currency mixing service, Bitzlato, based on a finding that it functioned as a primary money laundering concern in connection with Russian illicit finance.[19] But there, the administrative record overwhelmingly established that Bitzlato was functioning principally to aid unlawful activity. According to FinCEN, during a two-year period, 48% of the total known transaction value at Bitzlato involved "Russian illicit finance or other risky sources." 88 Fed. Reg. 3919, 3922. Bitzlato also publicly advertised "registration without KYC," 88 Fed. Reg. 3919, 3923, and had very little, if any, legitimate business in the United States. 88 Fed. Reg. 3919, 3924–25. Bitzlato's designation also came the same week that its founder and majority owner was arrested and criminally charged by the U.S. Department of Justice for unlawfully transmitting over $700 million dollars' worth of illicit funds.[20]

While FinCEN had no obvious and viable alternative measure for Bitzlato on the facts it established, that is far from the case with CIBanco—a company that has made clear its willingness to accept significant oversight and is already subject to additional Mexican regulatory receivership. FinCEN must, under the statute and the APA, consider less extreme solutions that could satisfy the government's interest.

### *B. The Government Violated the Fifth Amendment's Guarantee of Due Process by Denying CIBanco Notice and a Meaningful Opportunity to Be Heard.*

The Order is also a clear violation of CIBanco's constitutional due process rights. The necessary procedural protections vary depending upon the facts of each case, but "due process

---

[19] Following Russia's invasion of Ukraine, FinCEN was granted authority to target Russian illicit finance in a manner similar to the authorities in question here. 21 U.S.C. § 9714(a).

[20] *See* Press Release, Dep't of Justice, "Founder and Majority Owner of Bitzlato, a Cryptocurrency Exchange, Charged with Unlicensed Money Transmitting" (Jan. 18, 2023), https://www.justice.gov/usao-edny/pr/founder-and-majority-owner-bitzlato-cryptocurrency-exchange-charged-unlicensed-money.

requires, at the least, that an affected party [1] be informed of the official action, [2] be given access to the unclassified evidence on which the official actor relied and [3] be afforded an opportunity to rebut that evidence." *Ralls Corp. v. CFIUS*, 758 F.3d 296, 319 (D.C. Cir. 2014). CIBanco is suffering deprivations of its Fifth Amendment liberty and property interests without having received, in the first instance, the evidence upon which the Defendants have made their decision, and then, second, an adequate hearing for CIBanco to challenge this evidence.

**1. FinCEN's Order Deprives CIBanco of Its Protected Liberty and Property Interests.**

"[A] foreign organization that acquires or holds property in this country may invoke the protections of the Constitution when that property is placed in jeopardy by government intervention." *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 204 (D.C. Cir. 2001) (citing *Russian Volunteer Fleet v. United States*, 282 U.S. 481, 491–92 (1931)). Protected liberty interests "[w]ithout doubt" include "not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life," and, among other things, "generally to enjoy those privileges long recognized as essential to the orderly pursuit of happiness." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 572 (1972) (internal quotation marks, ellipsis, and citations omitted).

The Order deprives CIBanco of protected liberty and property in at least three ways: by (a) interfering with its property rights, most notably bank accounts, inside the United States; (b) interfering with CIBanco's protected contractual relationships with U.S. customers and U.S. financial institutions; and (c) harming CIBanco's reputation.

*a. Access to U.S. Bank Accounts.* As a result of the Order, CIBanco will—and has already begun to—lose access to the numerous bank accounts that it maintains inside the United States and the funds therein. As required under the Order, U.S. correspondent banks have

terminated or are in the process of terminating their relationship with CIBanco, leading CIBanco to lose access to its accounts inside the United States. De Jesus Decl. ¶ 36. CIBanco's last U.S. correspondent bank has told CIBanco that it will terminate its relationship on August 21, 2025. De Jesus Decl. ¶ 37. Closing these accounts leaves CIBanco without the ability to readily collect payments and fees from U.S. customers. De Jesus Decl. ¶ 36.c. And the Order is also interfering and will continue to interfere with the trust accounts CIBanco maintains inside the United States as part of its trust business. De Jesus Decl. ¶ 40.

The Order intends to deny CIBanco access to these bank accounts, and being denied access to a party's U.S. bank accounts is unquestionably a deprivation of property interests triggering the Fifth Amendment. *See Ralls Corp.*, 758 F.3d at 318 (noting due process attaches when a government action results in a private party being "prohibited from accessing its U.S. bank accounts"); *Nat'l Council of Resistance of Iran*, 251 F.3d at 201 (finding organizations could bring a due process challenge because they had "interest in a small bank account"); *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. Fed. Deposit Ins. Corp.*, 132 F. Supp. 3d 98, 124 (D.D.C. 2015) (finding a deprivation of "the previously held right to hold bank accounts" is sufficient to state a claim for violation of constitutional due process).

*b. Protected Contractual Relationships.* Separately, the Order deprives CIBanco of its protected property interest in contracts with its clients. As discussed, the Order has interfered with numerous existing CIBanco contracts. *See* De Jesus Decl. ¶¶ 42, 44, 64. The Order, for example, prompted Visa to terminate its contractual agreement with CIBanco under which Visa serviced Bank-issued cards; Visa's termination resulted in approximately 220,000 debit and prepaid cards being rendered non-functional for international transactions, Acosting CIBanco revenue from future card transactions. The Order has also led to the termination of derivative

agreements with U.S. counterparties, causing significant losses to CIBanco. CIBanco has also suffered as U.S. customers of the Bank, particularly in its trust division, have begun to move their trusts out of CIBanco to other institutions, which will cause additional lost revenue to the Bank.

All of these contractual arrangements with U.S. counterparties are substantive enough to give rise to Fifth Amendment due process protections. "[N]umerous courts have held that contracts between private parties may give rise to property interests sufficient to trigger Fifth Amendment due process protections." *Toxco Inc. v. Chu*, 724 F. Supp. 2d 16, 27 (D.D.C. 2010); *see also Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., Local 737 v. Auto Glass Emps. Fed. Credit Union*, 72 F.3d 1243, 1250 (6th Cir.1996) (observing that "property interests protected by the Fifth Amendment may be created by virtue of purely private contractual agreements").[21] The Order, in turn, clearly deprived CIBanco of these property interests, being the immediate cause of their termination. *See Greene v. McElroy,* 360 U.S. 474, 492–93 & n. 22 (1959) (permitting a due process challenge to the government's revocation of a security clearance that led to the termination of private employment); *Susman Godfrey LLP v. Exec. Off. of President*, __ F. Supp. 3d __, 2025 WL 1779830, at *20 (D.D.C. June 27, 2025) (finding an Executive Order deprived plaintiff "of its interest in contracting with clientele" by "attach[ing] a penalty" to contracting with the plaintiff).

*c. Reputational Interest.* As soon as it was issued, FinCEN's Order imposed deprivations of CIBanco's protected reputational interests. FinCEN labeled CIBanco a "primary money laundering concern in connection with illicit opioid trafficking." 90 Fed. Reg. 27770, 27776. In publicly promoting the issuance of FinCEN's Order, Defendant Bessent additionally

[21] This right applies as much to international contracts as it does fully domestic contracts. *Russian Volunteer Fleet*, 282 U.S. at 489 (Russian company entitled to Fifth Amendment protection when U.S. government interfered with its U.S.-based contracts).

accused CIBanco of "enabling the poisoning of countless Americans by moving money on behalf of cartels, making them vital cogs in the fentanyl supply chain." Press Release, U.S. Dep't of Treasury, "Treasury Issues Historic Orders Under Powerful New Authority to Counter Fentanyl" (June 25, 2025), https://home.treasury.gov/news/press-releases/sb0179. The impact of these actions was immediate and obvious: the government's branding of CIBanco precludes its very ability to operate its chosen business as an international bank, and the Order forces CIBanco to cede its extensive interests in U.S.-sited property.

The D.C. Circuit has "held on several occasions that government stigmatization that broadly precludes individuals or corporations from a chosen trade or business deprives them of liberty in violation of the Due Process clause." *Trifax Corp. v. Dist. of Columbia*, 314 F.3d 641, 644 (D.C. Cir. 2003) (collecting cases); *see also Susman Godfrey LLP*, __ F. Supp. 3d __, 2025 WL 1779830, at *19 (executive was required to provide process before issuing executive order containing "salacious allegations of wrongdoing"). For instance, due process liberty interests have been found to be triggered where the government alleged that a party "lacks honesty or integrity" or that employing said party would raise "counter intelligence concerns." *Trifax Corp.*, 314 F.3d at 644 (discussing *Old Dominion Dairy Prods. Inc. v. Sec'y of Def.*, 631 F.2d 953 (D.C. Cir. 1980), and *Kartseva v. Dep't of State*, 37 F.3d 1524 (D.C. Cir. 1994)). It is not necessary for the government to formally bar a party from its chosen business (though the Order will do just that once it goes into effect); a plaintiff's liberty interests are implicated when the "resulting stigma" from the government's actions "altered their status in a tangible way." *Id.* (citation omitted).

CIBanco has already begun to feel the tangible effects of being unjustly labeled a primary money laundering concern in connection with opioid trafficking. Customers have begun to withdraw deposits from the Bank. De Jesus Decl. ¶ 64. The Mexican government has begun to

take steps to seize CIBanco's $400 million trust division. De Jesus Decl. ¶ 62. CIBanco cannot continue its chosen business as an international bank with the stigma of FinCEN's Order, and Defendants' actions accordingly implicate CIBanco's liberty interests.

**2. FinCEN Did Not Give Any Advance Notice of Its Action, and CIBanco Was Therefore Deprived of Any Opportunity to Be Heard.**

Given CIBanco's liberty and property interests, it was entitled under the Fifth Amendment to adequate procedural protections before any deprivation of those interests. *Atherton v. D.C. Off. of Mayor*, 567 F.3d 672, 689 (D.C. Cir. 2009). The inquiry into the adequacy of the procedural protections afforded to CIBanco is quite simple here, as CIBanco received no notice at all before FinCEN issued its Order. It has still not received access to the unclassified evidence upon which FinCEN purportedly relied, and, as a result, still has not been given any opportunity to rebut that evidence. De Jesus Decl. ¶ 57. Defendants have therefore failed to meet even the bare minimum required by due process: "that an affected party [1] be informed of the official action, [2] be given access to the unclassified evidence on which the official actor relied and [3] be afforded an opportunity to rebut that evidence." *Ralls Corp.*, 758 F.3d at 319.

Under the familiar *Mathews v. Eldridge* factors, CIBanco was entitled to more than the bare minimum of procedural protections here. Those factors are (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Fares v. Smith*, 901 F.3d 315, 323 (D.C. Cir. 2018) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). Each factor weighs in favor of CIBanco needing to receive meaningful pre-

deprivation notice and an opportunity to respond to the purported evidence against it. Instead, it has received none.

With respect to the first *Mathews* factor, the private interest affected by FinCEN's action is significant: the crippling of CIBanco's entire business due to lack of access to the U.S. financial system, the loss of U.S. customers, and the accompanying stigma of being labeled a "primary concern for money laundering" in connection with opioid trafficking. The imminent losses here are literally in the hundreds of millions of dollars, not to mention the thousands of jobs that are at risk if CIBanco shutters. The D.C. Circuit has found that similar designations by the Treasury Department are "dire" as to the designee's private interests, as such a designation "shutters all [U.S.] domestic operations of an entity" and can render it "indefinitely . . . financially defunct." *Fares*, 901 F.3d at 323 (quoting *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 980 (9th Cir. 2012)).

On the second factor, "the risk of erroneous deprivation" is especially high where, as here, the impacted party does not have access to the government's evidence and accordingly does not have the "opportunity to probe or cross-examine on that evidence." *Fares*, 901 F.3d at 323. There has been no process through which CIBanco could respond to the government's specific concerns because Defendants have, to date, refused to share the evidence underlying those concerns in spite of CIBanco's repeated requests that they do so. De Jesus Decl. ¶¶ 49, 50, 53, 55, 57. As a result of Defendants' refusal to share any information that would allow CIBanco to meaningfully respond to the allegations against it, Defendants have no idea if CIBanco could have addressed their concerns or corrected any misunderstandings in how Defendants are interpreting their purported

evidence. The due process clause does not allow Defendants to just refuse to share information underlying the allegations they have publicly made against CIBanco.[22]

An agency must provide an impacted entity with any unclassified information upon which it relied in deciding to impose a designation or sanction on that entity. *Ralls Corp.*, 758 F.3d at 317; *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 613 F.3d 220, 227 (D.C. Cir. 2010) (group designated as foreign terrorist organization was deprived of due process where it "was notified of the Secretary's decision and permitted access to the unclassified portion of the record only after the decision was final"); *Nat'l Council of Resistance of Iran*, 251 F.3d at 209 ("[A]s soon as the Secretary has reached a tentative determination that the designation is impending, the Secretary must provide notice of those unclassified items upon which he proposes to rely to the entity to be designated. There must then be some compliance with the hearing requirement of due process jurisprudence—that is, the opportunity to be heard at a meaningful time and in a meaningful manner . . . ."); *see also Panthers v. Schweiker*, 652 F.2d 146, 168 (D.C. Cir. 1980) ("It is universally agreed that adequate notice lies at the heart of due process. Unless a person is adequately informed of the reasons for denial of a legal interest, a hearing serves no purpose . . . ."). FinCEN's Order states that it relied on "public and non-public information available to FinCEN," 90 Fed. Reg. 27770, 27771, so it has no excuse for failing to turn over any evidence underlying its Order to CIBanco.[23]

[22] The risk of erroneous deprivation seems particularly high because Defendants do not seem to have appreciated how many property interests were implicated by their Order, since the Order makes no mention of CIBanco's trust business, its U.S. operational bank accounts, its relationship to Visa, and other connections.

[23] CIBanco is unaware of any classified information upon which Defendants relied. In refusing to produce the requested information, Defendants have never suggested that information is classified. Even to the extent that some of the information FinCEN relied upon is classified, the Constitution does not permit it to refuse CIBanco the information it needs to fairly respond to FinCEN's

Finally, with respect to the third factor, while the government's interest in combatting illicit opioid trafficking is significant, FinCEN's actions do not indicate that providing appropriate pre-deprivation notice and an opportunity to be heard would have jeopardized those objectives. Defendants have not articulated any "special need" that would exempt them from pre-deprivation notice or opportunity to be heard. For example, the Order is not scheduled to go into effect until September 4, 2025—more than two months after it was first issued. If Defendants had legitimate concerns about CIBanco moving assets or otherwise engaging in some nefarious activity, they would not have allowed such a long lead time for this Order to become effective. *Contra Lopez Bello v. Gacki*, 94 F.4th 1067, 1075 (D.C. Cir. 2024) (post-deprivation notice permissible where there is a "special need" because pre-deprivation notice would allow alleged drug traffickers to drain assets).

Likewise, there is no real risk that providing CIBanco with unclassified evidence against it and a meaningful opportunity to respond would create a significant burden on the government. Defendants have issued orders targeting only three banks to date (CIBanco; Intercam Banco S.A., Institución de Banca Multiple; and Vector Casa de Bolsa, S.A. de C.V.) under its new authority. Though FinCEN may issue more orders under 21 U.S.C. § 2313a, it is unlikely to have to contend with hundreds of entities wanting to be heard regarding orders it has issued pursuant to the FEND Off Fentanyl Act.[24] Ultimately, "however weighty the governmental interest may be in a given case, the amount of process required can never be reduced to zero—that is, the government is never relieved of its duty to provide *some* notice and *some* opportunity to be heard prior to final

---

allegations. *Fares*, 901 F.3d at 324 (even where evidence supporting action against plaintiff is classified, government must provide "sufficiently specific" unclassified summaries to "provide plaintiffs with the 'who,' 'what,' 'when' and 'where' of the allegations") (quotation omitted).

[24] To date, neither Intercam Banco S.A. nor Vector Casa de Bolsa, S.A. de C.V. have publicly challenged the orders against them.

deprivation of a property interest." *Propert v. District of Columbia*, 948 F.2d 1327, 1332 (D.C. Cir. 1991) (emphasis in original). Even if Defendants could establish some sort of burden from providing appropriate procedural safeguards in this case, the Fifth Amendment guarantees CIBanco more process than it has been provided before it is stripped of its ability to conduct its banking business and of its U.S.-based assets.

## II. CIBanco Will Suffer Irreparable Harm Without Immediate Injunctive Relief.

This Court has previously held that the "very serious unrecoverable financial harm [the movant] has already begun to experience, along with the reputational damage caused by the [government's] designation, together constitute precisely the type of irreparable harm preliminary injunctive relief is designed to address." *Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 192 (D.D.C. 2021); *see also Xiaomi Corp. v. Dep't of Def.*, 2021 WL 950144, at *8–12 (D.D.C. Mar. 12, 2021). Those are exactly the circumstances that CIBanco faces here, along with the added irreparable injury of being deprived of its Fifth Amendment due process rights. *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) (likely deprivation of a constitutional right constitutes irreparable harm); *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (same).

The looming effective date of FinCEN's Order will impose irreparable harm absent a temporary restraining order because the Order poses an "existential threat to [CIBanco's] business[]." *Learning Resources, Inc. v. Trump*, __ F. Supp. 3d __, 2025 WL 152376, at *13 (D.D.C. May 29, 2025). The Order's grave threat to CIBanco's very existence has already started to materialize, with U.S. correspondent banks terminating their relationships with CIBanco, Visa unilaterally deciding to shut off access to its international network for approximately 220,000 cards issued by CIBanco, and the unilateral termination of derivative contracts by U.S. counterparties. Likewise, the Mexican government's announcement that it had begun the process to seize

CIBanco's trust division threatens a significant portion of the Bank's business and was explicitly linked to the Order's issuance. And because of FinCEN's Order, CIBanco has lost 40% of its total deposits as customers have already sought to close or transfer their CIBanco accounts. De Jesus Decl. ¶ 64. All of this in-progress destruction of CIBanco's business as a result of FinCEN's Order constitutes irreparable harm. *See Nalco Co. v. U.S. EPA*, 786 F. Supp. 2d 177, 188 (D.D.C. 2011) (finding irreparable injury where plaintiff demonstrated that challenged order would cause it to lose clients and make it difficult to attract new ones).[25]

Without immediate relief from this Court, the Executive Order will subject CIBanco to unrecoverable losses. Economic injuries of this nature—essentially destroying an entire business—justify emergency equitable relief when "legal remedies after the fact [are] inadequate to restore the party seeking a stay to the status quo ante." *Mann v. Wash. Metro. Area Transit Auth.*, 185 F. Supp. 3d 189, 195 (D.D.C. 2016). Here, CIBanco's business will not survive as an international commercial bank if it does not receive immediate relief.

CIBanco is also suffering the ongoing irreparable injury of reputational harm, as it has been marred by the designation of being a bank of "primary money laundering concern in connection with illicit opioid trafficking" and publicly accused by Defendant Bessent of "enabling the

---

[25] CIBanco's existential, ongoing harm would suffice to warrant emergency relief even if CIBanco could somehow recover against Defendants at the end of litigation. *Wisc. Gas Co.*, 758 F.2d at 674 (holding that "recoverable monetary loss may constitute irreparable harm" where "the loss threatens the very existence of the movant's business."). But CIBanco's need for a temporary restraining order is exacerbated by the fact that it would never be able to recover any damages against Defendants assuming they successfully assert sovereign immunity as a defense in a future damages action. Serious financial harm to CIBanco is accordingly irreparable even if it were not ruinous to CIBanco's business (as it is here). *Regeneron Pharms., Inc. v. U.S. Dep't of Health & Hum Servs.*, 510 F. Supp. 3d 29, 39 (S.D.N.Y. 2020) (holding Regeneron would likely suffer "irreparable financial loss absent a preliminary injunction" where monetary damages cannot later be recovered due to sovereign immunity); *see also Xiaomi Corp*., 2021 WL 950144, at *10; *Nalco*, 786 F. Supp. 2d at 188; *Brendsel v. Office of Fed. Housing Enter. Oversight*, 339 F. Supp. 2d 52, 66 (D.D.C. 2004).

poisoning of countless Americans." Defendants have both stated explicitly and implied through their designation that CIBanco is facilitating the deaths of Americans, and there can be no serious dispute that such accusations cause reputational harm to CIBanco. This harm, too, is irreparable and must be prevented from worsening. *See Lukong Tech. Corp*., 538 F. Supp. 3d at 194 (finding irreparable injury by way of "long-term reputational harm" where the government's actions "implie[d] that [plaintiff] is essentially a Chinese state organ seeking to undermine the security of the United States"); *Atlas Air, Inc. v. Int'l Brotherhood of Teamsters*, 280 F. Supp. 3d 59, 103 (D.D.C. 2017), *aff'd*, 928 F.3d 1102 (D.C. Cir. 2019). The harms that the Order has imposed on CIBanco have already brought it to the brink of disaster; if allowed to continue without a temporary restraining order, CIBanco's business will be destroyed entirely.

Finally, the failure to provide CIBanco with its constitutionally guaranteed rights is itself an irreparable harm. "A procedural violation can give rise to irreparable harm justifying injunctive relief because lack of process cannot be remedied with monetary damages or post-hoc relief by a court." *Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d 1255, 1290 (Ct. Int'l Trade 2019), *as modified*, 476 F. Supp. 3d 1323 (2020). Federal courts have repeatedly held that failure to adhere to procedural rulemaking requirements, such as the opportunity for comment and hearing, causes irreparable injuries to regulated parties. *See id.* ("A failure to comply with APA procedural requirements therefore itself causes irreparable harm."); *see also ITServe All. Inc. v. Scalia*, 2020 WL 7074391, at *10 (D.N.J. 2020) ("[M]any courts have found that a preliminary injunction may be issued solely on the grounds that a regulation was promulgated in a procedurally defective manner."); *Eli Lilly & Co. v. Cochran*, 526 F. Supp. 3d 393, 408 (S.D. Ind. 2021) (finding irreparable harm based on violation of APA's notice and comment requirement alone); *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 17-19 (D.D.C. 2009) (holding if the challenged rule is

"not enjoined prior to its effective date," then the plaintiff "will never have an equivalent opportunity to influence the Rule's contents," and this violation "cannot be fully cured by later remedial action.").

## III. The Balance of the Equities Strongly Favors CIBanco and a Temporary Restraining Order Serves the Public Interest.

The final two TRO factors—the balancing of the equities and weighing of the public interest—"merge when the [g]overnment is the opposing party." *Am. Ass'n of Political Consultants v. SBA*, 613 F. Supp. 3d 360, 365 (D.D.C. 2020) (quoting *Nken*, 556 U.S. at 435). Courts "must balance the competing claims of injury and must consider the effect on each party [and the public] of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008).

CIBanco has *already* suffered great economic and reputational damage and faces staggering additional losses without immediate relief from this Court. Even if there were only a "substantial risk" of a deprivation of "fundamental . . . right[s]," those damages are enough to tilt the equities against the government. *See League of Women Voters*, 838 F.3d at 12. Here, the Order will certainly result in the deprivation of fundamental rights. Of course, "[a]pplying the law in a way that violates the Constitution is *never* in the public's interest." *Minney v. U.S. Off. of Personnel Mgmt.*, 130 F. Supp. 3d 225, 236 (D.D.C. 2015) (emphasis in original); *see also Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333, 386 (D.D.C. 2020) (similar).

Defendants also have "no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12; *P.J.E.S. ex rel. Francisco v. Wolf*, 502 F. Supp. 3d 492, 546 (D.D.C. 2020). Rather, it is in the public's interest for agencies to be held to the guarantees of the Bill of Rights and federal laws, such as the APA, that govern their operations. *League of Women Voters*, 838 F.3d at 12; *see also N. Mariana Islands*, 686 F. Supp. 2d at 21 ("The public

interest is served when administrative agencies comply with their obligations under the APA."). The balance of the equities and public interest considerations here accordingly also favor entry of the emergency relief CIBanco is seeking.

It is also in the public interest for CIBanco to be able to preserve its status quo ability to transmit funds to and from U.S. financial institutions so that it may maintain its contracts with numerous U.S.-based entities and individuals that depend on that status quo. See *Robert Half Int'l, Inc. v. Billingham*, 315 F. Supp. 3d 419, 435 (D.D.C. 2018) ("The public has an interest in enforcing contractual agreements . . . ."); *Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 245 (D.D.C. 2014) (finding that balance of equities favored movants where they "largely s[ought] to preserve the status quo"). Likewise, it is in the public interest to ensure that tens of billions of dollars held in trust—including over $40 billion in trusts benefitting U.S. persons and companies—are not stranded in the chaos that will follow if CIBanco is fully disconnected from the U.S. financial system.

Defendants will surely note the countervailing interest in preventing illicit opioid trafficking—and that is an interest that CIBanco supports and stands ready to aid this Administration in pursuing, as it has repeatedly offered and will continue to do. But well-intentioned motives do not excuse unlawful actions, and Defendants are not permitted "to prioritize any policy goal over the Due Process clause." *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) (quoting *Gordon*, 721 F.3d at 653).

**IV. CIBanco Should Not Be Required to Post the Payment of a Bond.**

CIBanco respectfully requests that the Court waive any security under Rule 65(c). *See* Fed. R. Civ. P. 65(c). This Court has "wide discretion" to grant relief under Rule 65 without requiring the movant to post any bond. *Am. First Legal Found. v. Becerra*, 2024 WL 3741402, at *16 n.11 (D.D.C. Aug. 9, 2024). Here, the requested relief will "do the defendant[s] no material damage"—

and that fact counsels strongly in favor of "dispens[ing] with any security requirement whatsoever," as is typical in cases in which government action is at issue. *Id*. (quoting *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980)); *see, also e.g.*, *Widakuswara v. Lake*, 773 F. Supp. 3d 46, 62 (S.D.N.Y. 2025) ("[r]equiring that plaintiffs suing the government to vindicate constitutional and statutory rights" post large bonds "would ensure that very few individuals could afford to sue the federal [g]overnment," and federal defendants "can hardly gripe about" the cost of "abiding by their constitutional role as members of the executive branch"). Given the significant losses already sustained by CIBanco from the government's action, the waiver is particularly appropriate here.

**CONCLUSION**

Plaintiff's motion for a temporary restraining order should be granted.

Dated: August 17, 2025

Respectfully Submitted,

*/s/ Jeannie S. Rhee*
Jeannie S. Rhee (D.C. Bar No. 464127)
L. Rush Atkinson* (D.C. Bar No. 90025313)
Jenifer N. Hartley**
**DUNN ISAACSON RHEE LLP**
401 9th Street, NW
Washington, DC 20004
(202) 240-2900
jrhee@dirllp.com
ratkinson@dirllp.com
jhartley@dirllp.com

**Pro hac vice application forthcoming.*
***Admitted in NY only; practice supervised by members of D.C. Bar. Pro hac vice application forthcoming.*

Kenneth A. Blanco*
**ARKTOUROS PLLC**
One Biscayne Tower
Two Biscayne Blvd
Suite 1600
Miami, FL 33131
kenneth@arktouros.co